433 A.2d 1363

COMMONWEALTH of Pennsylvania ex rel. Robert Paul GRIMES and Mary Elizabeth Hazler

v.

Thomas and Wendy YACK, Appellants.

In the Interest of Rachel Marie YACK, a minor.

Appeal of Thomas and Wendy YACK.

In re Adoption of Rachel Marie YACK.

Appeal of Thomas and Wendy YACK.

Superior Court of Pennsylvania.

Argued Aug. 10, 1981.

Filed Aug. 21, 1981.

Petition for Allowance of Appeal Denied Oct. 26, 1981.

498

Marcel L. Groen, Cornwells Heights, for appellants.

Harry J. Newman, Bethlehem, for Grimes, appellee (at Nos. 1481 & 537) and participating party (at No. 1806).

David A. Scholl, Philadelphia, for Hazler, appellee (at Nos. 1481 & 537) and participating party (at No. 1806).

Abraham M. Mora and Jerome B. Apfel, Philadelphia, for Regional Counsel, participating party (at Nos. 1481 & 1806).

Before SPAETH, CAVANAUGH and MONTEMURO, JJ.

SPAETH, Judge:

Three appeals, which have been consolidated, are before us. In all of the appeals the appellants are Thomas and Wendy Yack. The subject of the appeals is a child, Rachel Marie, born March 20, 1980. Her mother and father, Mary Elizabeth Hazler and Robert Paul Grimes, are the appellees. Appellants got possession of the child with the intention of adopting her. They have nevertheless argued their appeals as though this were a child custody case. It is not. It is an adoption case. As an adoption case the only issue it presents is whether the record indicates any reason why appellees' interests as mother and father of the child should be involuntarily terminated. The lower court found no such reason and therefore ordered appellants to return the child to appellees. We affirm.

I

History of the Case

Ordinarily the history of a case may be told in a few paragraphs. Here that is impossible. For as will appear, appellants have complicated and delayed the case by engaging in an extraordinary series of legal maneuvers.

When the child was born, the mother was a seventeen-year-old unmarried high school student living with her parents in Northampton County, Pennsylvania. The father was twenty-two years old. Sometime after the mother became pregnant, she and the father stopped seeing each other. Before the child was born, the mother, partly in response to her parents' urging, agreed to give the child up for adoption. Arrangements for placement of the child with appellants were made by private intermediaries, one of whom was an attorney practicing in Northampton County. The child was born at a hospital in Lehigh County, Pennsylvania. On March 24, 1980, four days after the child's birth, the mother, while still in the hospital, and her mother signed a written consent to the placement of the child with prospective adopting parents and to the child's adoption. Shortly thereafter the mother gave the child to one of the intermediaries, who gave the child to appellants, who took her to their home in Bucks County, Pennsylvania.

## A

The events leading up to the first of the three appeals before us were as follows.

On March 26, 1980, six days after the child's birth, the father, who had consistently opposed any plan to place the child for adoption and who was unaware that the child had been placed, filed a petition with the lower court, seeking custody of the child from the child's mother and her parents. Within two to three weeks of the child's birth, the mother changed her mind about the adoption and informed the intermediary that she wanted the child back.

On May 23, 1980, the lower court held a hearing on the father's petition for custody. During the hearing both parents informed the attorney intermediary that they wanted the child back.[1] After the hearing the parents reconciled their differences, and in August 1980 they began living together.

---

1. This information does not appear in the record as transmitted to us. However, a copy of the notes of testimony of this hearing is included in appellee's brief in Appeal Number 537 as Appendix A.

The attorney intermediary notified appellants of the father's petition for custody and advised them that they should decide whether to return the child. According to Mr. Yack's later testimony, appellants' decision was "that [they] would go through a legal battle." N.T. 70, January 22, 1981. The lower court has found that appellants then "concealed their identity and whereabouts from the natural parents." Slip op. at 4.[2] Appellees nevertheless tried to obtain the child from appellants, and on September 3, 1980, they filed a petition seeking custody of the child from appellants. On September 17 appellants filed preliminary objections challenging the jurisdiction of the Northampton County court and its appropriateness as a forum. On November 17 the lower court denied appellants' preliminary objections, finding both jurisdiction and proper venue in Northampton County. The court also directed appellants to file within ten days "an offer of proof concerning the evidence they propose to introduce in opposition to the application for custody." Appellants did not comply with this order. Instead, they took an appeal to this court, which on February 3, 1981, we quashed as interlocutory.

Meanwhile, on January 22, 1981, the lower court held a hearing, at which both appellants and appellees testified. At the hearing counsel for appellants requested that the court order a blood test of the father to establish his paternity, that it order social investigations of both appellants and appellees concerning their fitness as parents, and that it order a psychological evaluation of the child. The court granted the first request. (The father submitted to a blood test and, on the basis of it, the lower court has found that he is the father.) It refused, however, to order the social investigations and the psychological evaluation. In addition, the court granted the request of appellants' counsel that he be permitted to submit a brief. Appellants subsequently submitted a memorandum of law arguing that appellees' rights as parents of the child should be involuntarily terminated.

2. This is the opinion filed on July 1, 1981.

On February 26, 1981, the court filed its opinion and order. The court found: (1) that the child's mother had revoked her consent to the child's adoption and had refused to relinquish voluntarily her parental rights; (2) that the child's father had never given his consent to adoption and had never relinquished voluntarily his parental rights; and (3) that there was no reason why appellees' parental rights should be involuntarily terminated. The court ordered appellants to deliver the child to the Children and Youth Division of Northampton County. It directed the Division to investigate appellees' living situations. If the living situations were "suitable for the immediate transfer of custody of the child," the Division was directed to deliver the child to either or both of appellees as the child's parents. If "the investigation reveal[ed] a need for further review of the child's needs prior to transfer of custody," the Division was directed to place the child with "foster parents other than the pre-adoptive parents until the court [could] further review the matter."[3] It is from this order of February 26, 1981, that appellants took the first of the three appeals before us, Number 537.

## B

The events leading up to the second of the three appeals before us were as follows.

Appellants did not deliver the child to the Children and Youth Division, as directed by the lower court. Appellees therefore filed with the lower court a petition for a rule to show cause why appellants should not be held in contempt. On March 9 the lower court issued a rule, returnable March 20. On March 10 appellants filed a petition for a supersedeas with this court. On March 12 we denied this petition without prejudice to appellants' right to petition the lower

3. Pursuant to this order, the Children and Youth Division prepared a report on appellees' living situations. This report identified some potential problems. As will be discussed, later testimony by the author of this report and other representatives of the Children and Youth Division established that these problems had been or were being corrected.

court for a supersedeas.[4] The lower court denied appellants' petition to it, but refused to find appellants in contempt. On March 31 appellants filed a second petition for a supersedeas with this court, which we denied on April 14.

Meanwhile, appellees had again asked the lower court to hold appellants in contempt, or in the alternative, to order appellants to allow them to visit the child. The court issued a rule to show cause, and on April 15 it found appellants to be in non-compliance with its order of February 26 and ordered them to deliver the child to the Children and Youth Division within 72 hours. The court directed the Division to arrange an emergency placement for the child until April 20 and ordered a hearing on that date "as a Juvenile Court matter in the nature of a Dependency proceeding." Finally, the court denied appellants' petition for a supersedeas.

Again, appellants did not deliver the child to the Children and Youth Division, as directed by the lower court. Instead, on April 20, which was after the seventy-two hour period had expired, they filed a third petition for a supersedeas with this court. On April 21 we denied this petition. On April 24 the lower court issued an order finding that appellants had not complied with the order of April 15 and directing the Sheriff of Bucks County to take possession of the child and deliver her to the Children and Youth Division. The court also directed the Division either to give the child to appellees as her parents "forthwith," or to file a dependency petition pursuant to the Juvenile Act, "whichever course of action it deems to be in the best interest of the child." On April 29 appellants filed a petition for supersedeas with this court. After staying the lower court order "pending further Order of this Court," on May 5 we denied the petition for a supersedeas.[5]

4. "Application for a stay of an order of a lower court pending appeal ... must ordinarily be made in the first instance to the lower court ..." Pa.R.A.P. 1732(a).

5. The record indicates that during this time appellants also applied for relief to the Supreme Court, which denied their applications on April 29 and May 19.

Appellants continued to refuse to deliver the child to the Children and Youth Division. On May 11, on appellees' petition, the lower court issued a rule to show cause why appellants should not be held in contempt. The rule was returnable May 29. Pending the contempt hearing, appellants filed a variety of papers. On May 21 appellants filed a praecipe for a jury trial and a "motion for discovery" in which they sought from the court and from appellees the following information:

1. The exact basis for the allegations of contempt against the respondents herein, Thomas and Wendy Yack.

2. The exact time the alleged contempt of court began.

3. State whether the contempt of court continues at the present time and if so, for what reason.

4. State the type of contempt seeking to be imposed upon the respondents, Thomas and Wendy Yack.

5. State the court's purpose for carrying out the contempt proceeding.

On May 26 appellants filed a petition for custody of the child, alleging that the court's order of February 26, refusing to order appellees' parental rights involuntarily terminated, had been issued without regard to the best interests of the child, that appellees as the child's parents were unfit and unable to provide for the child, and that "the Children and Youth Division of Northampton County [had] failed to provide for the necessary care, comfort and support of the said child and [had] no plans to do so." On May 29 appellants filed a "petition for reconsideration or modification of custody order," alleging that the lower court erred in its opinion and order of February 26 by treating the case as an adoption case rather than a custody case. In addition they alleged that they had obtained "new and additional evidence" indicating that appellees were unfit parents. They asked the court:

(a) to reconsider the evidence produced at the hearing of January 22, 1981 in addition to all new evidence presently available, and apply the body of law appropriate to a habeas corpus action, so as to deny the Petition for Habeas Corpus made therein, and/or;

(b) to modify the Order of April 15, 1981 to award temporary custody of the child, Rachael Marie Yack, to the petitioners, Thomas and Wendy Yack, until such time as the adoption action, presently pending in Northampton County [*sic*[6]], is resolved; and/or

(c) to award any and all other relief which the Court may deem appropriate.

Appellants also filed a petition asking that the lower court appoint counsel to represent the child.[7]

On May 29 the lower court held a hearing, without a jury, on the issue of appellants' contempt. In an order dated that day and filed on June 4 the court found appellants to be in wilful non-compliance of its order of April 15 "because [their] conduct ... demonstrated that they [had] acted knowingly and with the conscious object of not surrendering" the child. The court therefore adjudged appellants to be in contempt but offered them the opportunity to purge themselves by surrendering the child. Since appellants had informed the court that the child was ill, the court ordered them to deliver the child within fourteen days to the Children and Youth Division. The court ordered that appellants pay a penalty of $100 a day if they failed to comply. The court also directed the Children and Youth Division to arrange an emergency placement for the child. Finally, it directed that a juvenile court dependency hearing be held within 72 hours of the emergency placement.

On June 12 appellants delivered the child to the Children and Youth Division.

On June 15 the lower court denied appellants' May 26 petition for custody of the child and their May 29 "petition for reconsideration or modification of custody order," and

6. This appears to us to be an error. We believe that appellants were referring to proceedings in Bucks County. *See* discussion of the third appeal, No. 1481, *infra.*

7. At oral argument we were informed that this petition was filed on May 29. However, the record reveals that it was not entered on the lower docket until June 2.

held the dependency hearing that it had ordered.[8] Counsel for the Children and Youth Division stated that the Division did not wish to file a dependency petition. Counsel for appellants then announced that on appellants' behalf he wished to file a dependency petition and he presented it to the court. The court received it and held a full hearing on appellants' dependency petition. Both appellants and appellees presented evidence concerning appellees' character, past history, manner of living, and ability to take care of the child. Representatives of the Children and Youth Division testified that they had been working with appellees, and that the problems referred to in their earlier report had been or were being corrected and they were no longer concerned about them. After the hearing the lower court entered an adjudication finding the child dependent, saying that it was doing so primarily because the evidence suggested that the father, who had had problems with alcohol abuse when he was a teenager, might have continuing problems of that sort:

> I have no idea how long the dependency status should last, but I am satisfied that if I return the child right now to the care of Miss Hazler and Mr. Grimes, that there would be at a minimum physical dependency and I am still pursuing whether or not the child's safety would be jeopardized not because of any potential abuse on his part but because of what I still consider to be an unanswered alcohol problem.

> . . . . .

> [O]n the evidence I have here, I would be unwarranted in even concluding that there is a problem.

> N.T. at 2–3.

In order to resolve the "unanswered alcohol problem," the court requested the father to submit to an evaluation by the Northampton Council on Drug and Alcohol Abuse, which the

8. Although we find no express ruling, the lower court apparently denied appellants' petition that counsel be appointed for the child. The court also denied a motion filed by appellees on June 11 arguing that a dependency hearing was unnecessary.

father agreed to do, and set July 1 as the date for a dispositional hearing.

On June 24, in spite of the fact that the lower court had not yet made a final disposition concerning the dependency petition that they had filed, appellants once again petitioned this court for a supersedeas. On June 29 we denied this petition. Appellants then sought relief from the Supreme Court. On July 1, the day set for the dispositional hearing, Justice LARSEN entered an order stating "[t]he Order of the Court of Common Pleas of Northampton County placing the child ... in the custody of the Children and Youth Division without consideration of said child's best interests," and placing the child in the custody of appellants "pending the disposition of the appeal in this matter." Appellants' counsel then appeared at the dispositional hearing:

MR. GROEN: The other thing is, Your Honor, I have a praecipe and by way of motion I would like to, as Your Honor knows this was our petition for dependency, we feel that based upon Justice Larson's [sic] supersedeas that petition is now moot. As a result, we are filing a praecipe and I am making a motion to permit us to withdraw our original petition for dependency so in fact there is nothing further before the Court. I have that praecipe which I would like to hand up to the Court. THE COURT: The motion is received as being properly before the Court; however, the motion is denied because the Court believes that the interest of justice requires the Court to go ahead and enter a disposition.
N.T. at 2–3.

The lower court then entered a memorandum opinion and disposition order terminating its dependency adjudication of June 15 and awarding custody of the child to appellees. In view of the stay entered by Justice LARSEN, however, the court directed the Children and Youth Division to release the child to appellants, in whose custody the child was to remain "pending the appeal in the Superior Court, unless the supersedeas is sooner dissolved." Slip. op. at 6.

The lower court explained its disposition order as follows: On June 15, 1981, the Yacks petitioned the court for a finding of dependency. In doing so, the Yacks fully realized that a dependency adjudication would not help them over the long run. All they could possibly gain is a few more weeks or months of temporary custody.

At the conclusion of the dependency hearing, we found it was necessary to get an evaluation regarding the natural father's use of alcohol. To insure the child's welfare and safety, we made a finding of dependency. But, dependency findings are never final. In addition, dependency does not lead to the forfeiture of parental rights. Instead, dependency makes the child a ward of the juvenile court until the natural parents eliminate the causes of the court's concern.

On June 22, 1981, we received an evaluation from the Drug and Alcohol Division of the County of Northampton. The contents of the report must remain confidential, but we may disclose that there was no indication that the father's alcohol use presented a threat to the child's safety.

Moreover, this court must give considerable weight to the recommendation of the Children and Youth Division of Northampton County. That agency finds the natural parents are fit. In fact, the agency opposed the Yacks' request for a finding of dependency at the June 15th hearing.

We do not question the Yacks' love for the child. However, they took the child knowing that the mother might change her mind. Also, the substantial emotional bond the Yacks have developed with the child cannot be given much weight. Only the initial period of three weeks can be attributed to the adoption proceedings. Thereafter, the Yacks maintained physical custody of the child through their own unilateral action. For the first five months they concealed their identity and whereabouts from the natural parents. When they were located, they refused to return the child pending several more months of litigation. After the decision went against them, the

Yacks failed to comply with orders of this Court and extended the period for an additional few months.

Finally, we are aware that the termination of the adoption proceedings has brought grief to the Yacks. Nevertheless, the solution they offer would not be better than that dictated by the settled law.

While the Yacks concede that they can never adopt the child, they are asking for custody as foster parents. But, such a solution means the child will never have legal parents. To make matters worse, the child would have no emotional stability. The natural parents could constantly petition for rehearings on custody orders placing the child with the Yacks. From now until age 18, the child could be dragged into courtrooms where she would see her natural parents battling her foster parents for custody. We cannot believe the Yacks want to face such a bleak future for themselves or the child.

It has been suggested that the natural parents may break up in the future. The flaw in this argument becomes obvious when viewed in the light of statistics revealing that less than one-half of our families are staying together. So, a broken home is a risk all children are running in these times whether their parents are married or unmarried.

Nor, can we consider the superiority of the Yacks' resources. In this country, we do not deprive parents of their children because their home is "submarginal", or because their life-style is likely to result in a "cultural deprivation." *In re William L.*, 477 Pa. 322, 383 A.2d 1228 (1978), cert. den., 439 U.S. 880 [99 S.Ct. 216, 58 L.Ed.2d 192] (1979).

Slip op. at 3–5.

On July 8 the Supreme Court in a *per curiam* order vacated Justice LARSEN's order granting appellants a stay pending appeal. Appellants did not, however, deliver the child to appellees. Instead, on July 9 they filed an action in the federal district court and sought a temporary restraining order. The district court refused to issue a restraining

order. On July 10 appellants delivered the child to appellees.

On July 20 appellants took an appeal from the lower court's order of July 1 terminating the dependency proceedings. This appeal, Number 1836, is the second appeal before us.

## C

The events leading up to the third of the three appeals before us were as follows.

Shortly after receiving the child in March 1980, appellants filed a report of intention to adopt in Northampton County. Sometime later—the record does not disclose just when but it was after the child's mother withdrew her consent to the adoption—appellants withdrew this report. Brief for Appellants in No. 537 at 3; Brief for Appellants in No. 1481 at 8, note 1. On April 28, 1981, more than a year after they had received the child, and after many proceedings, in the Northampton County court, this court, and the Supreme Court, appellants began adoption proceedings in Bucks County by filing in the Bucks County Court of Common Pleas, Orphans' Court Division, a report of their intention to adopt the child and a petition seeking the involuntary termination of appellees' rights as parents of the child. On May 4 appellants filed in the Bucks County court an amended petition for involuntary termination and a "petition for supersedeas and review" in which they asked that pending a hearing in the adoption proceeding, the court stay the February 26, April 15, and April 24 orders of the Northampton County court. (The February order, it will be recalled, was that appellants should deliver the child to the Northampton County Children and Youth Division within 72 hours, and the two April orders arose from appellants' failure to comply.) On May 12 [9] the Bucks County court filed an order dismissing appellants' adoption proceeding and their petition for a stay of the orders of the Northampton County court. On June 8

9. This order was dated May 8 but was entered on the lower court docket on May 12.

appellants took an appeal to this court from this order. This appeal, Number 1481, is the third appeal before us.

On July 16, after conferring with counsel for the parties, we ordered that all three appeals should be argued on August 10, 1981. We also granted leave to counsel for the Regional Council of Child Psychiatry to appear as *amicus curiae.*

## II

### Appeal No. 1481

We shall first dispose of the third appeal before us, for we may do so rather summarily.

In its opinion prepared pursuant to Pa.R.A.P. 1925 and filed on June 11, 1981, the Bucks County court said that it had dismissed appellants' adoption proceeding and their petition for a stay of the orders of the Northampton County court for the following reasons:

> Even though we might have the inclination, which we expressly state we do not have, to grant the petitioners' request, we do not have the authority to do so. The Court of Common Pleas of Northampton County has jurisdiction over this matter and has rendered its decision. The petitioners have exercised their right of appeal to an appellate court. No supersedeas has been granted by the appellate court. This litigation should be confined to the court which has properly acquired jurisdiction of the case, namely the Northampton County Court. See *Trees et al. v. Glenn, Appellant.* 319 Pa. 487 (1935) 183 [181] A. 579. To hold otherwise would lead to endless litigation and forum shopping.

> Slip op. at 2.

Appellants argue that the Bucks County court "commit[ted] reversible error when it dismissed the adoption proceedings before it because of an entirely different suit in another county[.]" This argument is without merit. As the procedural history of the case makes clear, the proceedings in Northampton County were not "entirely different" from

the adoption proceedings in Bucks County. The Northampton County court's order of February 26, from which appellants took their first appeal to this court, was from the Northampton County court's determination that the mother of the child had effectively revoked her consent to adoption, that the father had never given his consent, and that there was no reason why their parental rights should be terminated involuntarily. As the Bucks County court noted, appellants' appeal from this order was pending when appellants attempted to begin adoption proceedings in Bucks County.

■ Appellants also argue that the Bucks County court "should have exercised judicial restraint and either granted the appellants leave to petition for a change of venue or allowed the appellees the opportunity to raise the question of improper venue via preliminary objection." This argument is also without merit. Appellants have no standing to say what "opportunity" should have been granted appellees. The suggestion that the court should have granted appellants "leave to petition for a change of venue" is disingenuous. For the court to have done that would have been to "grant" appellants something they obviously not only did not want but were seeking to escape. Appellants did not want their adoption proceedings transferred from Bucks County to Northampton County. They had filed a report of their intention to adopt in Northampton County, but then had withdrawn it. Having lost in Northampton County, appellants sought to start the litigation anew in Bucks County. Not content with their appeal of the Northampton County court's order to this court, they requested the Bucks County court to stay the Northampton County proceedings. The Bucks County court was quite justified in saying that to grant appellants' petition to it "would lead to endless litigation and forum shopping."

## III

### Appeal No. 1806

This is the second appeal, from the July 1, 1981 order of the Northampton County court terminating the adjudication of dependency entered on June 15.

The appeal is an anomaly. One would suppose that a party appealing an order that a child was *not* dependent would seek an appellate order that the child *was* dependent. However, that is not what appellants seek. Appellants only filed a petition alleging that the child was a dependent child [10] when at the June 15 hearing counsel for the Children and Youth Division of Northampton County specifically declined to file a dependency petition, stating that the Division saw no basis for one.[11] After appellants had obtained a stay of the lower court's order of February 26 (directing that they surrender the child) from a Supreme Court Justice, they attempted to withdraw their dependency petition as "moot." Finally, appellants do not ask us to declare the child dependent; rather, they ask us to award custody of her to them. Brief for Appellants in Number 1806 at 49.

■ Appellants' attempt to use the provisions of the Juvenile Act to delay the implementation of the lower court's

**10.** The Juvenile Act defines a dependent child as one who:
(1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals;
(2) has been placed for care or adoption in violation of law;
(3) has been abandoned by his parents, guardian, or other custodian;
(4) is without a parent, guardian, or legal custodian[.]
42 Pa.C.S.A. § 6302 (1981 pamphlet).
The Juvenile Act provides five other definitions of a dependent child, but none is applicable here.

**11.** Counsel for the Children and Youth Division said:
Based on our investigation, the names that were given to us by Mr. Groen, the attorney for the Yacks, and based on our contact with the natural parents, this Agency has not found sufficient evidence to find that the child is dependent and, therefore, has not filed a dependency petition.
There are a number of areas of concern that were cited in the initial report, some of those problems have been resolved by the natural parents. There are continuing areas of concern in the home which in the view of the caseworkers who have been working with the natural parents feel that with sufficient support of services the child could be returned to the home and would not be in the status of a dependent child with the services that would be provided.
So our Agency has not filed a dependency petition.
N.T. at 6.

orders that they surrender the child and to obtain custody of the child was clearly improper. *See In the Interest of Theresa E.*, 287 Pa.Super. 162, 172, 429 A.2d 1150, 1155 (1981) ("[A] dependency proceeding under the Juvenile Act is not to be regarded . . . as an alternative way . . . to seek custody.").

■ Appellants' appeal is in any event without merit. At the June 15 hearing the lower court received voluminous testimony concerning appellees' fitness as parents. The court then stated that it "would be unwarranted in even concluding that there [was] a problem." Adjudication, N.T. 3. Nevertheless, because the father admitted to having abused alcohol as a teenager and some question had been raised as to whether this abuse continued, the court—out of an abundance of caution—asked the father to submit to an evaluation by the Northampton Council on Drug and Alcohol Abuse. He agreed to do so, and after receiving the evaluation, the court terminated its adjudication of dependency. The court's findings that the child was not a dependent child and that appellees were fit parents are supported by the record. This is not to say that appellees do not have problems. They are young and inexperienced; they do not have much money; their home is simply furnished and in need of some repairs; as a teenager the father had serious problems with alcohol and with the juvenile authorities.[12]

12. Since appellants do not seek an order declaring the child dependent, we need not discuss the evidence in any detail. We have, however, reviewed the evidence and note that in their brief and at oral argument appellants have presented a highly colored and most inaccurate picture of it. *See* Brief for Appellants in Number 1806 at 4–8, 23b–23c, 36–38. For example:

Appellants have characterized appellees' living conditions as "deplorable." Brief for Appellants in Number 1806 at 8. While there was some evidence of unkemptness, both the agent for appellees' landlord and representatives of the Children and Youth Division, among other witnesses called by appellees, described appellees' home in detail and testified that conditions were generally good (five rooms downstairs, two bedrooms upstairs, paneled, carpeting, kitchen with tile floor, bathroom with a shower, and electric heat, with a thermostat in each room), and also, that appellees had made and were making improvements, including enlarging the bathroom to include a bathtub. N.T. 192, 194–97, 199, 204, 296–98.

However, as we observed in *In re Rinker*, 180 Pa.Super. 143, 117 A.2d 780 (1955):

A child cannot be declared "neglected" merely because his condition might be improved by changing his parents.

Appellants have also attacked appellees' manner of living, making a variety of charges, including the following.

At oral argument appellants' counsel characterized appellees' life as marked by "financial instability." The agent for appellees' landlord testified that appellees always paid their rent on time. N.T. 191–92. The mother had been employed at the Moravian College cafeteria but was laid off for the summer. She testified that although she had received an offer of employment doing office work, she planned to remain at home and care for the child. N.T. 345–46. The father testified that he had been offered a job doing insulation work and expected to begin that work the day after the hearing ended. N.T. 311–12, 328–29.

Appellants also say that "[s]ome of [appellees'] friends include members of the Pagan motorcycle gang and other criminal types who gather at the house for beer parties." Brief for Appellants in Number 1806 at 38; also, *id.* at 7–8. There was some evidence of parties. As regards the Pagan motorcycle gang, the evidence was that the father was acquainted with one person who, he believed, was a Pagan and that that person had been to appellees' house once to use the telephone. N.T. 317–18, 334, 355. Two of appellees' neighbors testified that they had never seen signs of a motorcycle gang at appellees' house. N.T. 213, 223, 227–28, 238.

Appellants also say that "[the father] himself was known to be particularly violent while drinking as evidenced by one incident where he threw a knife at, and injured, his mother's live-in boyfriend while intoxicated." Brief for Appellants in Number 1806 at 36. The "boyfriend," whom appellants called as their witness, testified that the incident referred to occurred when the father was 14 or 15 years old—the father is now 23 years old—N.T. 103–04; that the lower court ("the late Judge Palmer") ordered the father to go to Keenan House; and that when the father came out, his attitude was entirely different ("more responsible"; "went to welding school, he was trying to improve himself"; "drank very little"). N.T. 108.

Appellants also object that the father and mother are not married, saying that the father refuses to marry her. Brief for Appellants in Number 1806 at 7. Appellees both testified as to their plans to marry. N.T. 341–42, 362–63. On cross-examination the mother testified:

Q. Would you like to get married?
A. Yes.
Q. If you had your way about it, would you be married today?
A. I don't think so.
Q. Why have you waited to get married?
A. The same thing he [the father] told you, we just felt like everybody was forcing us to and we didn't want to do it like that. We wanted to do it in a relaxed atmosphere. We wouldn't be, you

The welfare of many children might be served by taking them from their homes and placing them in what the officials may consider a better home. But the Juvenile Court Law was not intended to provide a procedure to take the children of the poor and given them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.

*Id.*, 180 Pa.Super. at 148, 117 A.2d at 783.

*And see In re Custody of Frank*, 11 Pa.Super. 229, 423 A.2d 1229 (1980); *In the Interest of LaRue*, 244 Pa.Super. 218, 366 A.2d 1271 (1976); *Stapleton v. Dauphin County Child Care Service*, 228 Pa.Super. 371, 324 A.2d 562 (1974).

Appellants suggest that if we do not grant them the custody they seek, we should remand the dependency case for further proceedings. In support of this suggestion they offer two arguments.

First, appellants argue that the lower court's reliance on the "confidential" evaluation of the father by the Drug and Alcohol Division of Northampton County was in violation of their constitutional rights. In support of this argument they cite *In the Interest of Jones*, 286 Pa.Super. 574, 429 A.2d 671 (1981), in which we held that due process required that a mother know the identity of an adverse witness and be allowed to be present when the witness testified at a dispositional hearing.

> know, this would all be over with. We want it to be a happy occasion, not something we are forced to do.
> Q. Is your testimony the same as his then, that you are going to wait until this proceeding is over before you get married?
> A. Yes.
> Q. Does that mean if you were not to get Rachael *[sic]* back you would not get married.?
> A. I did not say that at all. We are getting married either way.
> N.T. 362–63.

█ The difficulty with this argument is that a remand to enable appellants to see the confidential evaluation [13] would serve no legitimate purpose. An appellate court should not remand with instructions to a lower court to conduct further proceedings unless those further proceedings would be proper. Here, as we have discussed, appellants' dependency petition cannot be the basis of a proper proceeding, and therefore of a remand, for it was not an attempt to have the child declared dependent but an attempt to obtain custody of her. *In the Interest of Theresa E., supra.*

Second, appellants argue that the lower court erred in refusing to appoint counsel to represent the child. Appellants did not ask the lower court to appoint counsel for the child until May 29, 1981,[14] which was four months after the hearing that resulted in the lower court's order of February 26 finding no reason why appellees' parental rights should be involuntarily terminated. Despite the belated nature of the request, the court might have granted it. As the *amicus* points out in arguing that the court should have appointed counsel to represent the child, appellants and appellees had interests that conflicted with the child's, and the appointment of counsel to represent the child might have resulted in other evidence being offered and other issues raised. Brief for *Amicus Curiae* at 11, 19–23.

█ If the proceeding had been a dependency proceeding, the lower court would have been obliged by the provisions of the Juvenile Act to appoint counsel to represent the child. 42 Pa.C.S.A. § 6337. *And see Stapleton v. Dauphin County Child Care Service, supra.* If the proceeding had been for custody of the child, the court would have had discretion to appoint counsel to represent the child, which it should have exercised in favor of appointment if it believed that the child "need[ed] someone to protect and advance [her] interests." *Lewis v. Lewis,* 271 Pa.Super. 519, 414 A.2d

13. So far as the record discloses, appellants did not ask to see the evaluation when they were before the lower court. Also, appellees were prepared to call as a witness the author of the evaluation.

14. *See* footnote 7 regarding the date of this petition.

375, 379 (1979). In a proceeding such as this one, was for the involuntary termination of parental rights under the Adoption Act of 1970, Act of July 24, 1970, P.L. 620, No. 208, art. I, § 101 *et seq.*, 1 P.S. § 101 et seq., the court was not obliged to appoint counsel, although we believe that the court nevertheless had discretion to appoint counsel. Under the Adoption Act of 1980, Act of Oct. 15, 1980, P.L. 934, No. 163, § 1, effective Jan. 1, 1981, 23 Pa.C.S.A. § 2313, "[t]he court shall appoint counsel to represent the child in an involuntary termination proceeding . . . ." As the lower court pointed out, however, this proceeding began before the effective date of the Adoption Act of 1980, and no later request was made that the Act should apply. The court therefore properly conducted the proceeding under the Adoption Act of 1970.

▮ While thus noting our opinion that the lower court could, and perhaps should, have appointed counsel to represent the child, we are not persuaded that in refusing to appoint counsel the lower court abused its discretion. Moreover, for us to remand for the appointment of counsel now would be unwise, for it would further prolong this already too prolonged litigation. *Cf. Tomlinson v. Tomlinson*, 248 Pa.Super. 196, 374 A.2d 1386 (1977) (award of custody to father reversed and custody award to mother where record complete and remand would prolong litigation unnecessarily).

## IV

### Appeal No. 537

This is the appeal from the order of February 26, 1981, in which the lower court stated that "the physical custody of [appellants] as pre-adoptive parents is revoked" and directed appellants as pre-adoptive parents "to surrender physical custody of the child to the Children and Youth Division of Northampton County no later than seventy-two (72) hours hours after notice of entry of [the] order."

A

■ The lower court accompanied its order with an opinion that included findings of fact and conclusions of law. The court's conclusions of law were: (1) that the mother "has revoked her consent to the adoption of her child born March 20, 1980, and has refused to voluntarily terminate her parental rights to such child;" (2) that the father "has neither given his consent to the adoption nor granted a voluntary termination of his parental rights to the child;" and (3) that "insufficient grounds exist to involuntarily terminate [the mother's and father's] parental rights." Slip op. at 9. Despite these conclusions, appellants have argued their appeal as though it were from an order entered in a child custody case. It is therefore necessary to note at the outset that this is not a custody case. It is an adoption case.

Nothing shows this more plainly than appellants' own actions. They do not propose to share the child, with appellees having the right to visit her. They wish exclusive possession of the child as theirs. Shortly after they received the child from the intermediary, in March 1980, they filed in Northampton County a report of their intention to adopt her. When, because of appellants' refusal to return the child, appellees were obliged to sue for her return, appellants argued to the lower court the issue of whether appellees' parental rights should be terminated. It was in response to these arguments that the lower court filed its opinion and order of February 26.

The fact that appellants subsequently withdrew their report of intention to adopt and began to argue to the lower court that this was a custody case is immaterial. Calling a case by another name does not change it.[15] Appellants' determination to adopt the child has remained fixed. By late April they had begun adoption proceedings in Bucks County; and, when the Bucks County court dismissed the

15. Nor is it significant that this case was captioned as a custody case. When appellants as pre-adoptive parents refused to return the child, appellees were forced to sue for her custody. That fact does not, however, transform this from an adoption to a custody case.

proceedings, they took an appeal to this court, in which they ask us to reserve and remand for a hearing on the termination of appellees' parental rights. Brief for Appellants in Number 1481 at 13.

## B

As an adoption case, this case is governed by the provisions of the Adoption Act of 1970, 1 P.S. § 101 *et seq.*, repealed effective January 1, 1981.[16]

Section 411 of the Act provides that "consent to an adoption shall be required of . . . [t]he parents or surviving parent of an adoptee who shall not have reached the age of eighteen years." [17] 1 P.S. § 411. Section 414 specifies the circumstances in which parental consent is not required:

Consent of a parent to adoption shall not be required if a decree of termination with regard to such parent has been entered. When parental rights have not previously been terminated, the court may find that consent of a parent of the adoptee is not required if, after hearing as prescribed in section 313,[1] the court finds that grounds exist for involuntary termination under section 311.[2]

1 P.S. § 414.[18]

16. As we have already mentioned, in discussing whether to remand for appointment of counsel, *supra* at 35, the Legislature has enacted a new Adoption Act, 23 Pa.C.S.A. § 2301 *et seq.*, effective Jan. 1, 1981, which, however, is not applicable since this case commenced prior to the effective date of the new Act and neither party requested leave to amend to conform to its provisions. Our discussion will therefore be in terms of the Act of 1970. However, we shall also note the parallel provisions of the Act of 1980. As regards this case, the new and old Acts do not differ significantly, for the legislature has preserved the basic structure of the Act of 1970 with regard to the termination of parental rights and the consents necessary for adoption.

17. The Supreme Court has declared unconstitutional a further provision of Section 411 that "[i]n the case of an illegitimate child, the consent of the mother only shall be necessary." *Adoption of Walker*, 468 Pa. 165, 360 A.2d 603 (1976). The parallel section of the Act of 1980 is 23 Pa.C.S.A. § 2711(a)(3).

18. 23 Pa.C.S.A. § 2714 (1980 Act).

Parental rights may be "previously . . . terminated" in one of two ways: a parent may voluntarily terminate his or her parental rights through a voluntary relinquishment proceeding, 1 P.S. §§ 301, 302, 303; [19] or a parent's parental rights may be involuntarily terminated, 1 P.S. §§ 311, 312, 313.[20] If parental rights have not been terminated, settled Pennsylvania case law establishes that "consent to adoption by the natural parent may be withdrawn at any time before entry of the final decree of adoption." *In re Adoption of R. W. B.*, 485 Pa. 168, 172 n. 2, 401 A.2d 347, 349 n. 2 (1979). *See also In re Adoption of Baby Girl Fleming*, 471 Pa. 73, 369 A.2d 1200 (1977); *Chambers Appeal*, 452 Pa. 149, 305 A.2d 360 (1973); *Hunter Adoption Case*, 421 Pa. 287, 218 A.2d 764 (1966); *Gunther Adoption Case*, 416 Pa. 237, 206 A.2d 61 (1965); *Hildenbrand Appeal*, 405 Pa. 579, 176 A.2d 900 (1962); *Harvey Adoption Case*, 375 Pa. 1, 99 A.2d 276 (1953); *Susko Adoption Case*, 363 Pa. 78, 69 A.2d 132 (1949). *And see K. N. v. Cades*, 288 Pa.Super. 555, 432 A.2d 1010 (1981).

In handing down its opinion and order of February 26, 1981, the lower court accurately applied the law as we have summarized it. Since it found that neither of appellees as the child's parents had terminated his or her parental rights through a voluntary relinquishment proceeding, the court considered whether it should order their rights terminated involuntarily.

Section 311 of the Act provides [21] that parental rights may be terminated involuntarily for any of three reasons:

19. 23 Pa.C.S.A. §§ 2501, 2502, 2503 (1980 Act).

20. 23 Pa.C.S.A. §§ 2511, 2512, 2513 (1980 Act).

21. 23 Pa.C.S.A. § 2511 (1980 Act) provides:
 (a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
 (1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
 (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity,

The rights of a parent in regard to a child may be terminated after a petition filed pursuant to section 312,[1] and a hearing held pursuant to section 313,[2] on the ground that:

(1) The parent by conduct continuing for a period of at least six months either has evidence a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties; or

(2) The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent; or

(3) The parent is the presumptive but not the natural father of the child.

1 P.S. § 311.

abuse, neglect or refusal cannot or will not be remedied by the parent.

(3) The parent is the presumptive but not the natural father of the child.

(4) The child is in the custody of an agency, having been found under such circumstances that the identity or whereabouts of the parent is unknown and cannot be ascertained by diligent search and the parent does not claim the child within three months after the child is found.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

Since the Act of 1980 is not applicable to this case, we need not decide the effect of the "[o]ther considerations" provision.

With respect to the third of these reasons, the lower court found that the father was in fact the natural father of the child. (As we mentioned in the history of the case, appellants requested, and the father agreed to, a blood test.) Slip op. at 2, Finding of Fact No. 4. With regard to the first and second reasons, the court found that the evidence did not warrant a finding that either reason had been satisfied. Slip op. at 5–8.

As a matter of law, the lower court's order and the findings and conclusions in support of it, are unchallenged. Instead of challenging them, appellants have chosen to argue that the lower court should have treated this as a custody case rather than an adoption case. As we have seen, however, this argument is belied by appellants' own actions in insisting upon adoption.[22] Appellants do not ar-

---

**22.** Appellants cite numerous involving the rights of third parties who are not parents to have custody of a child, for example, *In re Custody of Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977); *Commonwealth ex rel. Piper v. Edberg*, 346 Pa. 512, 31 A.2d 84 (1943); *Commonwealth ex rel. Ruczynski v. Powers*, 206 Pa.Super. 415, 212 A.2d 922 (1965) *aff'd*, 421 Pa. 2, 219 A.2d 460 (1966); *In re Oelberman*, 167 Pa.Super. 407, 74 A.2d 790 (1950); *Petition of Sulewski*, 113 Pa.Super. 301, 173 A. 747 (1934). All of these cases are factually different and none stands for the proposition that pre-adoptive parents can circumvent the Adoption Act by wrongfully refusing to return the child. In *In re Custody of Hernandez, supra,* we said:

There can be no question that stability is important to a child's welfare, and that in deciding who should have custody of the child it will therefore always be essential to consider how long the child has spent with the third party. *Commonwealth ex rel. Bankert v. Children's Services*, 224 Pa.Super. 556, 307 A.2d 411 (1973); *commonwealth ex rel. Kraus v. Kraus, supra* [185 Pa.Super. 167, 138 A.2d 225 (1958)]. This consideration, however, must take into account all of the evidence, including the reasons why the child has been so long with the third party. It has repeatedly been held that the fact that a child has been away from a parent for a long time will not by itself defeat the parent's right to custody. *In re: Adoption of Farabelli*, 460 Pa. 423, 333 A.2d 846 (child had lived with grandparents from birth until age of eight); *Commonwealth ex rel. Johnson v. Pinder*, 217 Pa.Super. 180, 269 A.2d 511 (1970) (during child's nineteen months of life father in Illinois working and attending college and able to visit child three times); *Commonwealth ex rel. Lovell v. Shaw*, 202 Pa.Super. 339, 195 A.2d 878 (1963) (five year old child with grandfather and step-grandmother since age of ten months).

gue that so far as the law of adoption is concerned, the lower court committed any error—and they could not, for the lower court's statement of the law was correct, and its findings are supported by the record.

## C

Given the Pennsylvania law,[23] what were appellants' choices when, shortly after they received the child, the

> To hold otherwise would be to enable the third party to defeat the child's parent by force—by keeping possession of the child, and by prolonging that possession by litigation. We have never permitted such tactics to succeed.
> *Id.*, 249 Pa.Super. at 296–97, 376 A.2d at 660.
> In addition to their argument that the case should be treated as a custody case, appellants argue that the lower court was "without authority to award custody of the . . . child to the Children and Youth Division, an non-party lacking standing with respect to a habeas corpus action for custody of this child." Brief for Appellants in Number 537 at 24–25. In their brief in support of the appeal from the dependency proceedings they cite *Hemenway v. Hemenway*, 284 Pa.Super. 481, 426 A.2d 149 (1981), for the proposition that "[w]here the state is not a party to a custody proceeding, when there is no petition for [d]ependency and the state does not submit a plan for the care, maintenance and custody of a minor child, it is error for the court to award custody of the child to the state." Brief for Appellants in Number 1806 at 19–20. *See also In re Custody of Frank*, 229 Pa.Super. 11, 423 A.2d 1229 (1980). However, we do not read the court's order as an award of custody to the Children and Youth Division, but rather as an attempt to make the transfer of the child from appellants to appellees as painless as possible. Even if this order and the later orders (issued when appellants failed to surrender the child) should be so read, appellants' challenged to is now has no merit. If appellants had obeyed the order, and the Division had both failed to initiate dependency proceedings and refused to surrender the child to appellees, *appellees* might well have been able to challenge that refusal. That issue, however, is not before us.

**23.** As our discussion above indicates, the law is clear. This does not mean that changes in the law have not been suggested. There has been, for example, a great deal of controversy about placements through private intermediaries—as in this case—as opposed to placements arranged by agencies. *See* Independent Adoptions: Is the Black and White Beginning to Appear in the Controversy Over Gray-Market Adoptions?, 18 Duquesne L.R. 608 (1980) (commenting on some of the arguments for and against private adoptions, and referring to proposed model legislation and to the laws of the various states). It may be that agencies are less likely than private intermediaries to place a child with pre-adoptive parents before the child's parents have voluntarily relinquished their parental rights in a sol-

mother revoked her consent to the adoption and they were informed that the father had not only never consented at all but had sued for custody of the child? First, appellants could have returned the child. Or second, if they believed they had any basis for doing so, they could have filed a petition under the Adoption Act asking the court to terminate appellees' parental rights involuntarily. These were appellants' only proper choices, for they knew that they did not have appellees consent to the adoption and that neither parent had gone through a voluntary relinquishment proceeding.

Instead of abiding by the Adoption Act, appellants sought to circumvent it. They neither returned the child nor filed a petition to terminate appellees' parental rights involuntarily but instead decided to keep her and "go through a legal battle." N.T. 70, January 22, 1981. When appellees as parents sued for return of the child, appellants engaged in an extraordinary number of legal maneuvers and, when the case was finally resolved, in still more maneuvers to avoid obeying the court's order. We know this case has involved great pain—to appellants, appellees, and the child. However, but for appellants' intransigence, much of that pain could have been avoided.

## V

### The *Amicus Curiae's* Argument

In response to its request, we permitted the Regional Council of Child Psychiatry to file a brief and present oral argument as *amicus curiae*. The Council's membership consists of 175 child psychiatrists who practice in Pennsylvania, New Jersey and Delaware. The Council suggests: (1) that we should remand this case to the lower court with instructions to take evidence "concerning the best interests of [the

emn court proceeding. *Id.* at 644. (We note that under the Adoption Act of 1980 a parent seeking to relinquish his or her parental rights voluntarily must personally appear at the hearing. 23 Pa.C.S.A. § 2503(a).) However, it is for the Legislature to weigh the advantages and disadvantages of private placement adoptions. Our responsibility is to enforce the law as enacted by the Legislature.

child] including that relating to her mental and emotional health in accordance with the standards set forth [by the Council in its brief];" (2) that we order the lower court to appoint counsel to represent the child; and (3) that pending final adjudicating, we "return [the child] immediately to her psychological parents [appellants] . . . to prevent any further mental, emotional, or physical harm from befalling her. . ." Brief for *Amicus Curiae* at 33.

 We have already explained why we believe it would be unwise to remand for the appointment of counsel to represent the child.[24] We also believe it would be unwise to remand for further evidence.

After appellants delivered the child to the Children and Youth Division of Northampton County, and before the Division delivered the child to appellees, the child was examined by a child psychiatrist. We are advised by the Council that

> had the child psychiatrist been permitted to testify [at the July 1, 1981, dispositional hearing], her testimony would have indicated that Appellants had become the psychological parents of [the child], that considerable harm had already occurred to her mental and emotional well-being, and that a permanent change of custody to Appellees could result in permanent psychological damage.

Brief for *Amicus Curiae* at 30.

In support of its argument that we should remand for the lower court to receive testimony by the psychiatrist, the Council summarizes "much medical and scientific literature," Brief for *Amicus Curiae* at 30, as follows:

> A child under 5 years has a unique irreplaceable relationship to his mother, that upon losing her he react *[sic]* intensely, initially making attempts to retrieve her and accepting substitutes reluctantly or not at all. Eventually if his loss persists, he may despair and then give up, but in doing so, he develops defenses which make him unable to love anyone else as trustingly or with the same depth.

24. *See* pages 1375–1376 *supra*.

Although superficially he may look as if he has adjusted to his new way of life, in fact, he holds himself aloof, never trusting, never caring with an inward depressive core, which affects his personality development profoundly and usually leads to some form of psychopathology later on in childhood, adolescence, or adulthood. This pathology can take the form of depression, delinquency, or a character disorder in which the individual has great difficulty in loving or allowing himself to be loved.

*Id.* at 31.

The Council also relies on decisions of this court, in particular *In the Interest of Tremayne Quame Idress R.*, 286 Pa.Super. 480, 429 A.2d 40 (1981), in which we recognized the importance to a very young child of a stable relationship with a parental figure. *Id.*, 286 Pa.Super. at 496–97, 429 A.2d at 48–49.

We accept the Council's representation that if we were to remand, the psychiatrist who examined the child would testify as indicated by the Council. We note, however, that professional opinion is not uniform. *In Interest of Tremayne Quame Idress R., supra,* we said:

Some authorities, particularly those with a psychoanalytic orientation, take the position that continuity is absolutely critical, particularly in very early childhood. *see, e. g.,* J. Bowlby, Attachment and Loss, Vol. I: Attachment (1969). Vol. II: Separation, Anxiety and Anger (1973); J. Goldstein, A. Freud, A. Solnit, Beyond the Best Interests of the Child, especially at 31–52 ("On Continuity, a Child's Sense of Time, and the Limits of Both Law and Prediction") (1973). Others dispute this, maintaining that children are developmentally much more resilient. *See, e. g.,* A. and A.C.B. Clarke, Early Experience: Myth and Evidence (1976); J. Kagan, R. Kearsley, P. Zelazo, Infancy: Its Place in Human Development (1978); M. Rutter, Maternal Deprivation Reassessed (1972). We are not required to settle this scientific dispute. It is enough to say that continuity is an important consideration at every age. *Id.*, 286 Pa.Super. at 495 n. 6, 429 A.2d at 48 n. 6.

Here it is especially probable that if we were to remand, the expert testimony would be in conflict. The continuity of relationship that concerns the Council has already been broken. Young as she is, the child knows appellees, and has lived with them. There is room, we expect, for reasonable difference of opinion as to whether in such circumstances it would be in the best interests of the child to attempt now to cut off, or suppress, her relationship with her parents.

If, however, we suppose for the sake of discussion that on remand all of the experts would subscribe to the psychiatric views expressed by the Council, still we should not be persuaded to remand.

The interests of a doctor caring for a patient are not always the same as the interests of the law. A doctor may believe that the proper treatment of a patient calls for certain action, but it does not follow that the law will approve that action. Sometimes this point is made by saying that the law should not be based on a "medical model." In the criminal law, for example, a psychiatrist may believe that a defendant should not be held responsible for conduct defined by the law as criminal. "Responsibility," however, is not a medical but a legal concept. In deciding whether a defendant should be characterized as "mentally ill" or as a "criminal," the law concerns itself with matters that the doctor does not.

> What psychiatrists may consider a "mental disease or defect" for clinical purposes, where their concern is treatment, may or may not be the same as mental disease or defect for the jury's purposes in determining criminal responsibility.
>
> *McDonald v. United States,* 312 F.2d 847, 851 (D.C. Cir. 1962).

*And see United States v. Brawner,* 471 F.2d 969 (D.C. Cir. 1972).

■ Thus, the medical concept of illness is not the same as the legal and moral concept of culpability. The same may be said of a child's "best interests;" it is a legal concept and is not to be defined in psychiatric terms. Without question,

psychiatry is one of the healing arts. An individual may be greatly helped by psychiatric treatment, and many have been. For the law to base itself on psychiatry, however, would transform the nature of law as we have conceived it and would entail great risk:

[P]sychiatry and psychoanalysis have redefined all problems of human life, all aspects of behavior, as medical problems and brought them within the medical model. The medical model proposes that conditions have discernable causes and scientific cures, that experts should exercise authority in the application of these cures, and that the nonexperts, the rest of the population, should submit to the authority of these experts. Such legal considerations as procedurally protected rights need not be given major consideration since the experts will presumably only be operating in the interests of those they serve.

J. Robitscher, The Powers of Psychiatry 38 (1980) (footnote omitted).

Recently, in *K. N. v. Cades, supra,* we had occasion to consider the concept of a child's best interests in the context of an adoption proceeding. The case was very similar to the present case. There, too, the child was placed for adoption, through an intermediary, by a very young, unmarried, mother, who soon changed her mind and wanted her child back. Finding no reason to order the mother's parental rights involuntarily terminated, the lower court ordered the persons to whom the child had been delivered, and who wanted to adopt the child, to return the child to her mother. On appeal, the pre-adoptive parents recognized the settled Pennsylvania law, which we have discussed above,[25] that "consent to adoption by the natural parent may be withdrawn at any time before entry of the final decree of adoption." *In re Adoption of R.W.B., supra* at 172, 401 A.2d at 349, n. 2. They urged, however, that we should change the law by holding that when a mother has surrendered her child for adoption, she should not be permitted to revoke her consent to the adoption unless she proves that that would be

25. *See* pages 1376–1377 *supra.*

in the child's best interests. This argument, it will be observed, is very similar to the Council's argument here. We refused to make such a change in the law, and affirmed the order of the lower court that the child be returned. We point out that in enacting the Adoption Act of 1980—the proceeding in *K. N.* was under that Act, since the child was born after January 1, 1981—the Legislature had not imposed any such requirement on a parent but had instead left in effect the statutory scheme of the Adoption Act of 1970, that parental rights may be terminated only by a voluntary relinquishment proceeding or an involuntary termination proceeding, thus necessarily implying its approval of the rule that a parent may withdraw consent to an adoption any time before entry of a final decree. We further said that in any case we were not persuaded that such a requirement should be imposed on a parent:

> The relationship between parent and child should be broken only with the greatest reluctance. Here, we think it would be unjust to hold the mother to her promise. She was very young. She consented to give her child up for adoption only in response to her parents' urging. She received no outside or professional counseling to guide her in making so agonizing a decision. And she only made the decision after being assured that she had six months within which to change her mind and get her child back. We do not question appellants' love for the child. However, they took the child knowing that the mother might change her mind.

*Id.*, 288 Pa.Super. at 555, 432 A.2d at 1016.

The present case is stronger than *K. N.*, where only the mother's parental rights were at issue. Here, the father's parental rights are at issue, as well as the mother's. Although the mother initially consented to an adoption, the father never did. Rather, within days of the child's birth he sought to have her. *See Adoption of Walker, supra* (father's parental rights where child is illegitimate must be recognized as equal to mother's).

One of the primary interests of the law is that might should never make right. To award the child to appellants on the theory of the Council would be the same as saying to appellants: "By keeping the child you made yourselves her 'psychological parents.' You knew or should have known that you had no right to keep her. However, since you did keep her, we shall give her to you." We shall not make such an award.

In each of the three appeals, the order of the lower court is affirmed.