465 A.2d 614

In re Shane DAVIS, A Juvenile.

Appeal of Annie S. MILLER and Harvey A. Miller, Appellants,

v.

BERKS COUNTY CHILDREN AND YOUTH SERVICES, Appellee,

and

Shane Davis, Appellee.

Supreme Court of Pennsylvania.

Argued May 27, 1983.

Decided Sept. 19, 1983.

114

William G. Sherr, Allentown, for appellants.

Robert J. Manara, Reading, for appellee Shane Davis.

Alan Readinger, Reading, for appellee Berks County Children and Youth Services.

Before ROBERTS, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

LARSEN, Justice.

The issue in this case can be stated in simple terms: whether the lower court erred in awarding custody of Shane Davis to the Berks County Children and Youth Services foster home agency. As is too often painfully clear in child placement cases, however, the resolution of this issue is far from simple, as it requires recognition of and provision for the delicate physical, mental, emotional and spiritual needs of a young child, the most exacting and sensitive scrutiny of the entire record, critical weighing and evaluation of numerous, often conflicting, variables reflecting upon the "best interests" of the child, and a solemn judgment, in light of all

of the variables, predicting which course of future action will be most likely to provide the child with a nurturing environment in which to develop to maturity.[1] The "tragic and lengthy" history of Shane Davis' case was set forth in the Superior Court's, 288 Pa.Super. 453, 432 A.2d 600, opinion, per Judge Wickersham, as follows:

In the mid–1950's, appellants, Annie S. Miller and Harvey A. Miller, had a farm and peach orchard in [Stony Run,] Berks County, Pennsylvania. They hired black migrant laborers to help them work the land. Betty Davis Pellot was the daughter of one such laborer. When Betty was abandoned on the farm at the age of two, the Millers took the child in and raised her.

When Betty was in high school, she apparently began using drugs and evidence was presented that her relationship with the Millers began to deteriorate. At the age of nineteen, Betty left the Millers' household to live on her own. On March 21, 1973, Betty gave birth to Shane Davis, the subject of this appeal. The child was born out-of-wedlock, son of an unknown Caucasian father. [Shane's features and appearance are that of a black child. Notes of Testimony (N.T.) at 38.] Shane was left with the Millers three days after his birth while his mother searched for an apartment. During the following months, Betty moved frequently and the Millers would care for Shane each time he became ill or when his mother was unable to care for him. Eventually, Shane moved in with the Millers on a permanent basis.

1. In these situations, the courts may be an imprecise and frequently unwieldy tool in the "selection and manipulation of a child's external environment as a means of improving and nourishing [the child's] internal development." Goldstein, J., Freud, A. and Solnit, A., *Beyond the Best Interests of the Child,* at 7 (Freedom Press 1973) (hereinafter referred to as *Beyond Best Interests*). When a child's placement is disputed and subject to conflicting adult interests, the legal structure is "confronted with a highly complex decision which involves, implicitly if not explicitly, a prediction about who, among available alternatives, holds most promise for meeting the child's psychological needs." *Id.* at 6. While courts are not ideally suited to the task, they are, with the help of social agencies and input adduced from the parties at evidentiary hearings, the best qualified institution at this time to render the decision.

On November 24, 1974, Betty Davis Pellot gave birth to twins, Shonda Lynn Davis and Sean Davis. The twins were also born out-of-wedlock, the children of a Caucasian father whose identity was known. Betty moved into a trailer on the Millers' farm after their birth. While the twins lived in the trailer with their mother, Shane continued to live in the house with the Millers.

After a year and a half of living on the farm, Betty married Pedro Pellot. Betty and the twins then moved to Reading, Berks County to live with her new husband. Shane stayed with the Millers.

After an altercation with Annie Miller on November 8, 1977, Betty took Shane to live with the rest of the family in Reading. The Millers then filed a petition for a writ of habeas corpus. The court awarded custody of Shane to Betty and liberal visitation privileges to the Millers. These visitation privileges soon became a source of conflict and Betty refused to allow the Millers to visit Shane. The Millers responded by petitioning the court to have Betty held in contempt. The court entered a new order on May 23, 1978 which awarded permanent custody of Shane to the mother but gave the Millers temporary custody for two weeks each summer.

Soon thereafter, Shane spent two weeks with the Millers. On August 14, 1978, less than a month after Shane's return to his mother's household, Betty was murdered by her husband in the presence of her three children. 288 Pa.Super. 458–59, 432 A.2d 602–03.

That day, August 14th, Berks County Children and Youth Services (Children's Services), appellee, filed an emergency custody petition in the Court of Common Pleas of Berks County. The court ordered temporary custody to Children's Services and all three children were then placed in the care of Iris and Larry Young, a married couple residing in Reading. The following day, upon appellants' petition, the court awarded temporary physical custody of Shane to the Millers pending disposition of the custody proceedings. The twins remained with the Youngs.

Evidentiary hearings were held before the Honorable Thomas J. Eshelman on three separate days, March 27, April 5 and August 1, 1979. (There is no clear explanation in the record for the inordinate lapse of time between the filing of the custody petition on August 14, 1978 and the hearings in March, April and August of 1979.) At these hearings, only Shane's custody was in dispute. (No one has ever challenged the court's determination that it was in the best interests of Shonda Lynn and Sean to be placed in the long-term foster care of the Youngs.) Counsel, Central Pennsylvania Legal Services (CPLS), was appointed to represent Shane throughout the proceedings in the lower court and on appeal.

It is important to recognize that, while an award of custody was sought in the name of Children's Services, the proceedings assumed the posture of a determination as to which couple—appellants or the Youngs—was most suited to provide for Shane's best interests. This was due to Children's Services' expressed intentions to keep the three Davis children together under the long-term care of foster parents and the Youngs' expressed intentions to raise all three children to maturity, as they had previously done with three other foster children. The appellants, as well, would raise Shane to maturity. Thus, the trial court did not treat the case as one of choosing between the Millers and institutional foster care, but rather, as is warranted by the evidence on the record, on a more personal level, considering the alternatives to be Shane's placement with either the appellants or the Youngs.[2]

Following the evidentiary hearings, the court issued orders on November 13 and 20, 1979, adjudicating Shane, Shonda Lynn and Sean "dependent" within the meaning of the Juvenile Act, 42 Pa.C.S.A. §§ 6301–6365. Custody of all three children was then awarded to Children's Services

2. Of course, since a custody award is always subject to modification by the court, such award is not "permanent." However, since neither appellants nor the Youngs have filed for adoption and since both couples would care for Shane until maturity, the posture assumed by the trial court was entirely appropriate.

(which, in the posture of this case, meant that physical custody would be with the Youngs). The court's orders also provided liberal summer and weekend visitation rights for appellants with Children's Services to arrange for Shane's transportation. The Millers appealed that determination and filed various applications for stays pending disposition on appeal, which were rejected by the lower court and subsequently affirmed by the Superior Court. It was developed at oral argument before this Court that the Millers have, with the consent of Children's Services, retained physical custody of Shane despite the denials of the applications for stays. On June 19, 1981, the Superior Court affirmed the lower court's award of Shane's custody to Children's Services. This Court granted the Miller's petition for allowance of appeal on October 16, 1981 and oral argument took place on May 27, 1983.

The paramount concern in all custody cases is the best interest and permanent welfare of the child. *Commonwealth ex rel. Zaffarano v. Genaro,* 500 Pa. 256, 261, 455 A.2d 1180, 1182 (1983); *Albright v. Commonwealth ex rel. Fetters,* 491 Pa. 320, 322, 421 A.2d 157, 158 (1980). All other considerations are deemed subordinate to the child's physical, intellectual, moral and spiritual well-being. *In the Interest of Tremayne Quame Idress R.,* 286 Pa.Super. 480, 484, 429 A.2d 40, 43 (1981).[3]

The scope of appellate review in child custody cases is, traditionally, very broad. *Commonwealth ex rel. Zaffarano v. Genaro, supra* 500 Pa. 262, 455 A.2d 1183. While such broad review does not grant a reviewing court license to nullify the fact finding functions of the lower court in the first instance, *id.,* it has been held that the appellate court is not bound by the deductions or inferences made from the

---

**3.** 42 Pa.C.S.A. § 6301(b) provides that the fundamental purpose of the Juvenile Act is "(1) To preserve the unity of the family whenever possible and *to provide for the care, protection, and wholesome mental and physical development of children....*" The lower court is instructed to enter an order of "disposition *best suited to the protection and physical, mental and moral welfare of the child.*" 42 Pa.C.S.A. § 6351(a) (emphasis added).

facts found by the lower court, *e.g., Tomlinson v. Tomlinson,* 248 Pa.Super. 196, 374 A.2d 1386 (1977), nor by findings which are unsupported by competent evidence. *In re Desiree B.,* 304 Pa.Super. 461, 463, 450 A.2d 1003, 1004 (1982). So as to facilitate the appellate court's broad review, it has consistently been required that the hearing court provide a complete record as well as a comprehensive opinion which contains a thorough analysis of the record and specific reasons for the court's ultimate decision. *E.g., In the Interest of Tremayne Quame Idress R., supra,* 286 Pa.Superior 488, 429 A.2d at 44. It is in light of the foregoing that we review the record and determination.

Preliminarily, appellant raises the threshold argument that the lower court erred in adjudicating Shane to be a "dependent" child under the Juvenile Act, 42 Pa.C.S.A. § 6302. If Shane was not, in fact, "dependent," then the lower court had no authority to order a disposition under § 6351, 42 Pa.C.S.A. § 6351. ("*If* the child is found to be a dependent child the court may make any of the following orders of disposition....") *See In re La Rue,* 244 Pa.Super. 218, 366 A.2d 1271 (1976). The Juvenile Act gives nine definitions of a "dependent child" which are stated in the disjunctive. 42 Pa.C.S.A. § 6302. The lower court held, with Superior Court affirming, that Shane was a dependent child within the meaning of subsection (4) which defines such a child as one who "is without a parent, gaurdian or legal custodian." We fully adopt the reasoning of the Superior Court in concluding that Shane is a dependent child as appellants do not fall within any of these categories.

Appellants maintain that the term "parent" should be defined and expanded to include those who stand in *loco parentis* to a child. There is no indication that the legislature intended "parents" to include anything other than natural, blood relationship parents, and adoptive parents and the Superior Court's opinion refusing to expand the definition is persuasive. 288 Pa.Super. at 462, 432 A.2d at

604–05 [4]. Furthermore, while appellants could be considered to be "custodians" as that term is defined elsewhere in § 6302, the lower court and Superior Court were correct in stating that the term "legal" must be given equal weight with "custodian" and the two read together. 288 Pa.Super. at 463, 432 A.2d at 605. The Juvenile Act unequivocally discloses that the legislature considered "custodian" and "legal custodian" to be separate and distinct. *See* 42 Pa.C. S.A. § 6357, Rights and duties of legal custodian ("A custodian to whom legal custody has been given by the court . . . has the right to . . . .").

Having properly adjudicated Shane to be a dependent child, the court was required to enter an order of disposition under 42 Pa.C.S.A. § 6351 which provides, in relevant portion:

**Disposition of dependent child**

(a) **General rule.**—If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the protection and physical, mental, and moral welfare of the child:

(1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.

(2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody to any of the following:

(i) Any individual resident within or without this Commonwealth, who, after study by the probation officer or other person or agency designated by the court, is

---

**4.** While the Superior Court did not indicate that "adoptive" parents would be included within the meaning of 42 Pa.C.S.A. § 6302(4) it is evident that such is the case. The Adoption Act provides that "parent" includes adoptive parents. 23 Pa.C.S.A. § 2102 (Purdon's Supp.1983–84). The Adoption Act and the Juvenile Act are in pari materia and, hence, must be construed together as one statute wherever possible. Statutory Construction Act of 1972, 1 Pa.C.S.A. § 1932 (statutes or parts of statutes are in pari materia, and must be construed together, when they relate to the same persons or to the same class of persons.)

found by the court to be qualified to receive and care for the child.

(ii) An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child.

(iii) A public agency authorized by law to receive and provide care for the child.

■ It should be obvious that in rendering the disposition "best suited to the protection and physical, mental, and moral welfare of the child," the hearing court and the reviewing court *must* take into account *any and all factors* which bear upon the child's welfare and which can aid the court's necessarily imprecise prediction about that child's future well-being. To that end, the legislature has, in the Juvenile Act, instructed the courts in disposition hearings that "all evidence helpful in determining the questions presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent in the hearing on the petition." 42 Pa.C.S.A. § 6341(d), Evidence on issue of disposition.

A review of appellate precedent in child placement cases illuminates the complexity of the disposition issue and demonstrates that, given the limitless combinations of tangible and intangible variables that produce the human condition, and given that in each custody dispute, at least three such combinations and conditions must be considered (the child and the contesting parties), it would be impossible to formulate any precise, mathematical equation. More so in child custody cases than perhaps in any other, judges must bring to bear all of the wisdom, common sense and sensitivity they can muster to render the disposition "best-suited" to the particular child's welfare, and to do so, they must be informed of all relevant information and weigh each factor, both on its own merits and in conjunction with all other factors. In performing this delicate task, courts have erred

by ignoring relevant factors [5] as well as by exaggerating any *one* factor.[6]

Guided by these principles, Judge Eshelman conducted the hearings with complete awareness that, in child placement proceedings, the best course to follow is to be quite liberal in allowing the admission of evidence and testimony that might be helpful to the court's difficult determination of Shane's best interests. Thus, he allowed "everything in the record but the kitchen sink." N.T. at 32. The court heard much evidence concerning the home environments of the appellants and the Youngs and concluded that each home and each couple were equally well-suited to provide for Shane's physical well-being. Appellants had already demonstrated their ability to provide for Shane's physical well-being on their nineteen acre farm in rural Stony Run, where he was well fed and clothed and had his own bedroom. The Youngs had demonstrated their ability to raise children successfully in their large home in Reading, having raised three of their own children to maturity with one minor child still living at home, and three foster children from the ages of seven or eight until their maturity.

The respective ages of the couples was also a consideration below. At the time of the hearings, Annie Miller was 75 (now 79) years and Harvey Miller was 83 (now 87) years. Iris Young was 39 (now 43) years at the time of the hearings. Mr. Young's age was not specified but presumed

5. *See, e.g., Gunter v. Gunter,* 240 Pa.Super. 382, 361 A.2d 307 (1976) (record failed to disclose whether trial court considered possible psychological bonding of child to couple who had physical custody of child) *and Commonwealth ex rel. Cox v. Cox,* 255 Pa.Super. 508, 388 A.2d 1082 (1978) (record failed to disclose consideration of comparative data on the homes, health and financial data of contesting parties.)

6. *See, e.g., Albright v. Commonwealth ex rel. Fetters, supra* (intermediate court erred in overemphasizing "preference" for natural parent in light of significant countervailing factors) *and Commonwealth ex rel. Lucas v. Kreischer,* 450 Pa. 352, 299 A.2d 243 (1972) (lower court erred in considering that mother's subsequent marriage to a man of another race was in and of itself sufficient reason to deny custody to mother in favor of natural father).

·to be under 50. While the court realized that age *alone* cannot be *the* determinative factor, *see Commonwealth ex rel. Kuntz v. Stackhouse,* 176 Pa.Super. 361, 108 A.2d 73 (1954), it did consider the advanced age of the Millers to be an important factor. This was not error. As was stated in *Commonwealth ex rel. Holschuh v. Holland-Moritz,* 448 Pa. 437, 444, 292 A.2d 380, 383 (1972), the "age of seventy and beyond is hardly an ideal time of life to be raising two boys on the verge of entering their teenage years."

At trial, the director of social services at Children's Services testified as to its policy of placing children with "natural" age parents. N.T. at 40. The reasons for such a policy are apparent: older foster parents may find it more difficult to maintain the physical effort required to control a young child; older foster parents have a greater likelihood of contracting extended chronic illnesses; the child may encounter peer group difficulties because of the advanced age of the foster parents. *In re Adoption of Michelle Lee T.,* 44 Cal.App.3d 699, 117 Cal.Rptr. 856 (1975). Just as the hearing court would have been remiss in relying on the age factor to the exclusion of all others, so too, the court would have erred in failing to consider it. While no "bright lines" can or should be drawn as to potential foster parents' ages, it cannot be denied that the ages of 75 and 83 years (now 79 and 87) could pose difficulties in the raising of a six (now ten) year old boy.

The other primary factor in the hearing court's determination was the well founded policy that brothers and sisters should be raised together in one household. It has always been a strong policy in our law (and a policy of Children's Services) that, absent compelling reasons to the contrary, siblings should be raised together. *Tomlinson v. Tomlinson, supra; Tobias v. Tobias,* 248 Pa.Super. 168, 170, 374 A.2d 1372, 1373 (1977); *Commonwealth ex rel. Martino v. Blough,* 201 Pa.Super. 346, 191 A.2d 918 (1963). This factor is not diluted by the fact that the children involved are half brothers and sisters. *Albright v. Commonwealth ex rel. Fetters, supra* 491 Pa. at 328, 421 A.2d at 161. "The

benefits to be derived from the three minors being raised in the same household provided a further factor that could properly be weighed . . . . " by the hearing court. *Id.* Furthermore, this policy is enunciated in the Juvenile Act itself. 42 Pa.C.S.A. § 6301 states: "(b) Purposes—This chapter shall be interpreted and construed as to effectuate the following purposes: (1) To preserve the unity of the family *whenever possible* . . . ."

■ Again, this factor cannot be automatically elevated above all others, but must be weighed in conjunction with the others. *See, e.g., In the Interest of Tremayne Quame Idress R., supra,* 286 Pa.Superior 494, 429 A.2d at 43–44, 45. In the instant case, Shonda Lynn and Sean are Shane's only known, living relatives. Prior to the tragic events of August 14, 1978, the three children had lived together for approximately 27 months. The children know each other and, when the twins would visit Shane at the Millers' farm, the three would immediately begin to play with each other. N.T. 102–03, 243. Accordingly, the hearing court properly considered that being raised together with his brother and sister would be a potentially potent, positive influence on Shane's healthy development.

Another factor which played a significant role at the hearings, but which the lower court disregarded in arriving at its custody disposition, was the race of the respective parties. The lower court stated at note 5:

> The question of race was also raised during the hearings. The Millers are white; Shane and the Youngs are black. Much of the record developed before the Court dealt with identity crises Betty Jean Davis Pellot allegedly suffered by being raised by white people. Annie Miller and Reverend Fritch both testified that Betty had no racial identity problems while Cheryl Roling, a BCCYS caseworker who for a time counselled Betty, claimed that she had a low self-esteem and a bias against blacks. We found most of this evidence either irrelevant or inconclusive and of little help in determining if the Millers' continued custody of Shane would have an adverse effect on the boy's develop-

ment. Mrs. Norma Fabian, Director of Social Services for the BCCYS, testified that the agency's policy is to place black children with black foster parents to inculcate a sense of racial and personal identity. This policy was urged upon the court, but it is not the law. Our Supreme Court has held that problems related to racial identity are inapplicable in a custody proceeding. *Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976); *Commonwealth ex rel. Lucas v. Kreischner,* 450 Pa. 352, 299 A.2d 243 (1973); *Milligan v. Davison,* 244 Pa.Super. 255, 260 n. 3, 367 A.2d 299, 302 n. 3 (1976). Our touchstone must be the child's best interests as defined by the courts and an extrajudicial consideration such as race has no place in our analysis.

■ Appellants argue that despite the court's disclaimer, the racial factor influenced its disposition and that such an influence was improper. We do not agree that race, in child placement cases, is an "extrajudicial consideration". For the reasons stated below, the court's failure to consider this factor was erroneous; however, the error was harmless as consideration of the factor would militate in favor of the court's award of custody to Children's Services to place Shane in the long-term care of the Youngs.

In *Commonwealth ex rel. Lucas v. Kreischer,* 450 Pa. 352, 356, 299 A.2d 243 (1973), this Court recognized the marked increase in interracial marriages and transracial adoptions and noted that, according to studies, children raised in homes wherein the parents are of different races do not suffer from this circumstance. Relying on *Kreischer,* we stated, in *Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 143, 360 A.2d 587, 591 (1976), "that problems related to racial identity [are] inapplicable in custody proceedings." These cases are inapposite to the instant situation, however, as they involved custody proceedings between natural parents where the mother had remarried a spouse of another race and the trial courts had denied custody to the mother in the absence of *any* evidence that some detriment was suffered by the children. The "real issue" posed by those cases

was "whether a subsequent interracial marriage by the mother, in and of itself, is such a compelling reason as will warrant a court in denying her the custody of her children." *Commonwealth ex rel. Lucas v. Kreischer, supra* 450 Pa. at 355–56, 299 A.2d at 245. Of course we answered in the negative, for racial tension between the mother's new spouse and the natural father can certainly have no bearing in a custody proceeding between natural parents where no harm to the children had been shown. *See also Milligan v. Davison,* 244 Pa.Super. 255, 260 n. 3, 367 A.2d 299, 302 n. 3 (1976). Such is not the situation presented herein.

In situations where the contesting parties in a custody proceeding are of different races and the child shares the racial characteristics of one of the parties, critical commentary, as well as near unanimous precedent, overwhelmingly adopt the position that the respective races of the participants is *a factor* to be considered in a child's placement determination but, *as with all factors, can be no more than that—a factor.* In 1972, the National Association of Black Social Workers adopted the position that black children should be placed only with black families, both in foster care and adoption, in order that the children "receive the total sense of themselves and develop a sound projection of their future." [7]

In 1973, in response to this position adopted by the Association, the Child Welfare League of America altered its former stance [8] and, in adoption cases, espoused a preference

7. Dawn Day, *The Adoption of Black Children,* at 98 (D.C. Heath and Company, 1979) (hereinafter cited at *Dawn Day*). Of course, it should be realized that this position advanced in 1972 by the Association is only one viewpoint and that the Association does not speak for all of black America. Neither can this position be read as prohibiting the placement of black children with non-black families where no other alternatives exist.

8. As an illustration of the perplexing nature of the problem of how much weight, if any, to be given to the race factor in child placement determinations, witness the experience of the Child Welfare League of America (hereinafter the League). Prior to 1958, the League included the following statement in its standards for adoption:

for placing children in families of their own racial background since children "placed in adoptive families with similar racial characteristics can become more easily integrated into the average family group and community." [9]

A child of one race living in an environment consisting totally or predominantly of another race may face an imposing array of problems. The non-immediate relatives (grandparents, aunts, uncles, cousins) of the adopting or foster parents may reject the child. Friends and neighbors may harbor racial animosity or be awkward in their dealings with the child, which may be manifested in insults and physical abuse. The child may have few role models. A predominantly different race environment tends to take on greater significance as the child approaches and reaches dating age, that trying time of youth when peer pressure can be so relentless and intense. Although the adopting/foster family may not object to transracial dating and marriage, friends, neighbors and relatives may well express disapproval.[10]

> Racial background in itself should not determine the selection of the home for a child. It should not be assumed (by the agency or staff members) that difficulties will necessarily arise if adoptive parents and children are of different racial origin.
> However, beginning in 1958, the League qualified the above statement with the following proviso: "Children with the same racial characteristics as their adopting parents could be more easily integrated into the average family." In 1963 this qualifying statement was deleted, and, in 1968 in response to the civil rights movement, the following qualifying statement was added by the League to encourage transracial adoptions: "In most communities there are families who have the capacity to adopt a child whose racial background is different from their own. Such couples should be encouraged to consider such a child."
> As noted in text, the League's position reverted in 1973, in accordance with the policy announced by the National Association of Black Social Workers, to .... expression of a preference for placing children in families of their own racial background. *See* Simon and Altstein, *Transracial Adoption* (New York: Wiley 1977) *and* Lucille J. Grow and Deborah Shapiro, *Black Children-White Parents: A Study of Transracial Adoption* (New York: Child Welfare League of America, 1974) (hereinafter referred to as *Grow*).

9. *Grow, supra,* note 8.

10. *See Dawn Day, supra* note 7 at 104–05. While these problems are discussed in terms of black children with white adopting parents, the

The cases that have given studied consideration to the issue of the relevance of race in child placement determinations have taken cognizance of these potential disadvantages to the placement of a child with foster or adoptive parents of another race and the advantages of "racial matching." *See e.g. Farmer v. Farmer,* 109 Misc.2d 137, 439 N.Y.S.2d 584 (1981) (extensive expert testimony received in case which, while not in complete accord, expressed views shared by many psychologists, psychiatrists and social workers regarding disadvantages of placing children with families of different racial composition, and advantages of "racial matching"); *Drummond v. Fulton County Department of Family and Children's Services,* 563 F.2d 1200, 1205 (5th Cir.1977) (court noting the difficulties inherent in interracial adoption justify the consideration of race as a relevant factor in adoption) *quoting Compos v. McKeithen,* 341 F.Supp. 264, 266 (E.D.La.1972); *Petition of R.M.G.,* 454 A.2d 776 (D.C.App.1982). *See generally,* Grossman, *A Child of a Different Color: Race as a Factor in Adoption and Custody Proceedings,* 17 Buff.L.Rev., 303 (1968) (hereinafter referred to as *Grossman* ) *and* Note, *Racial Matching and the Adoption Dilemma: Alternatives for the Hard to Place,* 17 J.Fam.L. 333 (1979) (hereinafter referred to as *Dilemma* ).

The major advantage of racial matching is, of course, providing an atmosphere in which to instill in the child a sense of personal and social identity. As expressed by the appeals court of the District of Columbia in *Petition of R.M.G., supra* at 454 A.2d 787, 791:

Whether adopted by parents of their own or another race, adoptees often find it difficult to establish a sense of identity. "Identity," in this context, has at least three components: (1) a sense of "belonging" in a stable family and community; (2) a feeling of self-esteem and confidence; and (3) "survival skills" that enable the child to cope with the world outside the family. One's sense of identity, therefore, includes perceptions of oneself as both

problems encountered in this situation are common to all cases where a child is placed in an environment dissimilar to his own racial background.

an individual and a social being. While adoptive parents' attitudes toward the adoption and their child are not the only influence on that child, these parental attitudes do affect, to a significant extent, whether the child will feel secure and confident in the family and community. Because race may be highly relevant to these parental attitudes, . . . it is relevant to the larger issue of the child's best interest.

. . . .

When race is relevant in an adoption contest, the court must make a three-step evaluation: (1) how each family's race is likely to affect the child's development of a sense of identity, including racial identity; (2) how the families compare in this regard; and (3) how significant the racial differences between the families are when all the factors relevant to adoption are considered together.

Just as race "obviously remains a key element in [child placement] proceedings," *Dilemma, supra* at 351, it is equally obvious, and uniformly stressed in the literature and appellate decisions, that race cannot be unduly emphasized either by the placement agency or hearing court, *e.g. Commonwealth ex rel. Lucas v. Kleischer, supra and Re Adoption of a Minor,* 97 App.D.C. 99, 228 F.2d 446, 54 A.L.R.2d 905 (1955), or by legislative enactment, *e.g. Compos v. McKeithen, supra* (Louisiana adoption statute which permitted adoption only by parents of same race as child struck down as unconstitutional and not in the best interest of the child). As the court stated in *Re Adoption of a Minor, supra* at 54 A.L.R.2d 908: "There may be reasons why a difference in race, or religion, may have relevance in adoption proceedings. But that factor alone cannot be decisive in determining the child's welfare. It does not permit a court to ignore all other relevant considerations."

In *Compos v. McKeithen, supra,* the Louisiana adoption statute which provided for adults to adopt only children of their own race was, incredibly, the basis of one agency's denial of a white couple's opportunity to adopt a black child and of a second agency's denying an interracial couple an

opportunity to adopt *any* child. The federal district court for the Eastern District of Louisiana declared the statute unconstitutional, stating:

> Cognizant of the realities of American society, this Court would agree that an interracial home in Louisiana presents difficulties for a child, including the possible refusal by a community to accept the child, and other community pressures, born of racial prejudice, on the interracial family. A determination of reasonableness of racial classification in this statute would seem to follow recognition of such difficulties, but we regard the difficulties inherent in interracial adoption as justifying consideration of race as a relevant factor in adoption, and not as justifying race as the determinative factor.
>
> .     .     .     .     .
>
> When the advantages of family life in promoting personality development and social adjustment are considered, the disadvantages of an interracial adoption cannot be said to outweigh in all cases the advantages of a home and family life to a child whose only alternatives are institutional life or foster home care. It is obvious, therefore, that the Louisiana statute making race the decisive factor in adoption subordinates the child's best interests in some circumstances to racial discrimination. The statute thus promotes not the child's best interests but only the integrity of race in the adoptive family relationship.
>
> .     .     .     .     .
>
> We have concluded that the Louisiana adoption statute cannot be justified under equal protection scrutiny.

*Compos v. McKeithen, supra,* 341 F.Supp. 264, 266, 267, 268 (1972).

In *Drummond v. Fulton County Dep't. of Family and Children's Services,* 563 F.2d 1200 (5th Cir.1977), white foster parents attempted to adopt a biracial child who had been in their care for over two years. When the state adoption agency acted to place the child elsewhere, the foster parents sued the agency under 42 U.S.C. § 1983. The district court dismissed the complaint, holding that while race had obvi-

ously entered into the agency's decision to refuse the adoption, the way in which race had been considered was perfectly proper since it had been directed to the best interest of the child. The Fifth Circuit Court of Appeals affirmed, holding that the state agency's consideration of race as a factor in adoption was not a violation of equal protection. The court concluded that "difficulties inherent in interracial adoption justify the consideration of 'race as a relevant factor in adoption . . .'" *Id.* at 1205. In concluding that there had been no violation of equal protection, the Fifth Circuit Court of Appeals noted the following factors, at 563 F.2d 1205:

> First, consideration of race in the child placement process suggests no racial slur or stigma in connection with any race. It is a natural thing for children to be raised by parents of their same ethnic background.

> Second, no case has been cited to the court suggesting that it is impermissible to consider race in adoption placement. The only cases which have addressed this problem indicate that, while the automatic use of race is barred, the use of race as one of the factors in making the ultimate decision is legitimate . . . .
> . . . .

> Third, the professional literature on the subject of transracial child placement stresses the importance of considering the racial attitudes of potential parents . . . .

> Fourth, in the analogous inquiry over the permissibility of considering the religion of would-be adoptive parents, numerous courts have found no constitutional infirmity
> . . . .

> Finally, adoption agencies quite frequently try to place a child where he can most easily become a normal family member . . . .

▮ It is also of significance that the Pennsylvania Adoption Act, like the adoption statute under consideration in *Drummond, requires* that an adoption petition set forth the racial background of adopting parents and the child to be adopted. *See* 23 Pa.C.S.A. § 2701(1), (5); § 2533(b)(2). Un-

like the Louisiana statute, the Adoption Act goes on to provide that "In any case, the . . . racial . . . background of the child or adopting parents shall not preclude an adoption but the court shall decide its desirability on the basis of the physical, mental and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2724(b). The Adoption Act and the Juvenile Act are in pari materia and must be construed together as one act to accomplish the common purpose. Thus, our General Assembly, the best barometer of social policy, has taken the position that race should be *a factor, but only a factor,* in determining the best interests of the child in placement proceedings.

As with *all* factors, however, the importance of race in a particular case will vary greatly in accordance with the vast array and unlimited combinations of facts and circumstances possible in child placement proceedings. Upon the record in the instant case, it is apparent that race is an important consideration to be factored into the determination of Shane's best interests. That record discloses the following.

Iris and Larry Young are black ministers residing in an urban community. They have a large family, four children of their own extended by three black foster children who maintain close ties with their foster parents. Most important, Shane's brother and sister, his only blood relatives, reside in the custody and care of the Youngs. Mrs. Young's testimony reveals her to be a loving, practical, compassionate and wise woman, a very successful mother, and one who is well aware of the problems faced by an interracial child and the psychological needs of that child.

Mrs. Young demonstrated her keen awareness of the problems Shane would likely face in being raised with white parents in an all white community, in the following series of questions and answers, N.T. at 115–118:

BY MR. STARK (Attorney for Appellants):

Q: He [Shane] is half white as well as being half black; isn't he?

A: [Mrs. Young] Can I tell you this? Does the white community accept him as being white? Do you think if

he goes in an all white classroom with all white kids, they are going to accept him as being white?

Q: Do you know whether Annie Miller accepts him as being white? Would you accept him as being black?

A: Yes, because he is.

Q: Would you accept him as being white?

A: I would accept him as being black.

.    .    .    .    .

Q: Do you know whether there have been some changes in the laws?

A: Excuse me?

Q: The United States and the state laws.

A: What law? What does a law change how a person feels about their self or how another person feels about another person? Does that really change?

Q: You tell me. That is what I would like to know. How many Negroes are playing major league baseball today?

A: What does that have to do with whether a child is accepted black or white? You understand what I am trying to say? Look. If I'm just here, and you bring him to here, and you say, Mrs. Young, what color is he, there is no way I can say he is white, because he's not, regardless of what his father or what his mother is. The black community accepts him as black; but a white community does not accept him as white. That's what it's all about.

Q: Do you know whether Annie Miller accepts him?

A: I hope she does. What does she accept him as, white or black?

Q: Do you know whether she accepts him not as white or black, as a child who she loves and who she's raised?

A: That's how it should be. That's how it should be.

Q: You agree then that that was a desirable way to handle things?

A: That is how it should be handled, sure.

Q: It then would be desirable that Annie and Harvey Miller would accept Shane as a child who they loved?

A: Right, but Annie Miller cannot go to school with him. Annie Miller cannot go play basketball with him. Annie Miller cannot go to his friends house and take that pain when they say, look, you're black, and I don't want you here. Annie Miller cannot be his friends.

Q: Do you know whether that has happened?

A: Oh, come on.

Q: Did it happen to you?

A: It happened to me, no, but it's happened to kids all around me.[11]

On the probability of Shane's adjustment to living with Mr. and Mrs. Young, Mrs. Young testified, N.T. at 110–111:

[E]ach child is different, you know. Shane is an individual. How can we classify him with a group of children? I don't know. But I will say that I have never had any trouble with kids adjusting no matter what their problem. I have had a child that was with her mother 12 years and constantly, and there was maybe one day just getting adjusted. We are not talking about placing him in a home where the parent or foster parent there has no recollection of what is going on; doesn't know how to handle it; doesn't know what to look for; doesn't know how to do the right thing. You are talking about placing him with me, which I know what to look for. I know where the trouble points are, and not only that you're placing him back with his family, you're placing him with his brother and sister. That's the only thing that he does have to cling to since he lost his parents. So it's not like we are talking about placing a child in a home that he's never been in. It's not like placing a child with strangers. He's been there. He's been smiling at me all morning. He knows me. He knows his sister and brother. Now we're talking different. That's what I'm saying. He's a differ-

11. Mrs. Young's opinion reflects the fact that in today's society, a person who has any black characteristics at all is generally perceived as black. *See* Dawn Day, *supra* note 7 at 96.

ent child. When he came with me that night he never said I want to go back or take me back, I'm unhappy. Usually kids, when they come, when they go to bed at night, there's problems. He was no problem. He laid down and went to sleep. He got up the next day; in fact, when the guy came he was playing.

In response to the question "Do you think that having some sense of racial identity and worth is important at the age of six?", Mrs. Young replied:

We're talking about children like—everybody is saying what they know is what they read, and everything they did. I'm just going to tell you from experience, because I've had kids that have been mixed all along, and I'm going to tell you how it is. No matter what color they are they identify with the color of where they're at. If a child is black and he's in an all white home, he's going to think that he is white. I don't care—I don't know how it happens. I can't explain how it happens, but that's what happens. And then he's unable to identify with his own race. When he comes around his own race, he's kind of standbackish at any age. At six they don't really care about color. They couldn't care if he were green. You know, it doesn't matter to them, and that's beautiful. That's nice. But then when you go—when you go to school and kids are into color, and it goes, then they begin to say, who am I. I have had kids come home and say what am I. And so it does make a difference. At one point in their life they have to be placed with a family— like they were telling me they'll place him with her, with someone else, and then they come back and visit just so he can know his identity. That's not making it. That's fooling with a kid's life. And he's at the age now where he can be bent. Why wait till he gets older to place him to let him know he's black. It's time now to do the bending. He's just a young . . . .

You are what your environment has you to be. What your home is. What you are raised.

In comparison with the environment at the Youngs' residence, the situation with the Millers does not seem to be very conducive to the inculcation of a sense of racial identity in Shane. At the outset, we must stress that we do not intend to cast any aspersions upon the character and/or racial attitudes of appellants. The record speaks loud and clear of their love and compassion for Shane and his mother (now deceased) and their genuine concern for people regardless of race. This discussion is only intended to demonstrate the relevance of race as a factor in this case and the minimal potential at the Miller farm in Stony Run for the nourishing of Shane's personal and social identity.

Stony Run is an almost all white community. There are no blacks in the schools, nor in the Lutheran Church which the Millers attend. N.T. 172 (Testimony of Reverend George Fritch). One black friend of Annie Miller visited her on the farm with her son who would play with Shane, but these visits were infrequent, about every other month. N.T. at 248 (Testimony of Lucille Alexander). There was no other testimony of other possible black contacts for Shane at Stony Run.

The testimony concerning Betty Davis Pellot, though the hearing court stated it was "inconclusive", strongly suggested that at least some of her problems arose as a result of or were exacerbated by her lack of a black identity. Even by Mrs. Miller's admission, Betty "wanted to be white." N.T. at 231. A caseworker from Children's Services testified that Betty "had no social situations at all which allowed her to get to know the black community," was "prejudiced against blacks", was fearful of people of her own race, and had little self-esteem which, in the caseworker's opinion, could be attributed to her lack of racial identity. N.T. at 132–140 (Testimony of Cheryl Roling).

From the foregoing, we must conclude that, under the facts and circumstances of this case, the racial backgrounds of Shane, the Youngs and the Millers should have been taken into account in the determination as to Shane's welfare and best interests. However, since this factor would

.have supported the court's award of custody to the Youngs, any error in failing to consider the evidence offered in this regard was harmless.

The importance of race, generally, in child placement proceedings will hopefully diminish as racial bias and prejudice loses its vitality in our society. In the meantime, courts must take care not to overemphasize the importance of race as a factor in child placement proceedings, for to do so could be to inadvertently place a premium on preservation of a status quo of racial prejudice.

As one commentator has written:

"While adoptions concern only a limited number of individuals in a society, the handling of the matter of the disposition of a human life can both reflect that society as well as act back upon it." . . .

The most significant element in a child's development, according to most authors, is the environment in which he spends his early years . . . . The role of the family in this process is, of course, pervasive. . . . Thus, the home life experienced by a child is critical in determining his ego-strength and his ability to cope with the pressures he will face as an adult. Where a child, therefore, will otherwise have an unsatisfactory developmental environment, placement in a home where he would receive love and acceptance would seem to override almost any objection raised because of mere racial differences.

[T]here is a second reason for endorsing interracial adoptions even in the face of the tensions they may produce. American society is currently struggling with an agonizingly difficult "race problem." Although visible signs do not all point in the same direction, the goal ahead appears to be greater acceptance of racial integration in many areas of American life. Individuals who are in the vanguard of this social movement as it goes along its jolting, jarring way, should be encouraged, not deterred. As one writer has asked, is it "good public policy to require people who have no prejudices to conform to the standards of the

prejudiced ....? [I]s it wise to require the socially healthy to keep step with the socially ill?"

*Grossman, supra* at 303, 331–33. This point is well taken. As society "shrinks" due to the influence of rapid, world-wide transportation, instant electronic media and telecommunications, as populations shift from the farms to the cities to the suburbs and back again, as people thereby become exposed to an ever increasing variety of experiences, and as courts remain vigilant to prevent discrimination in whatever form, it can be expected that racial attitudes will continue to improve.[12]

All reasonable people look forward to the day when racial prejudice and tension has disappeared; until that day comes, however, this Court would be remiss in our obligation to determine and further a child's best interest if we ignored the relevance of race in placement proceedings.

▪ Another consideration which, in this case, is crucial to the determination of Shane's well-being is the psychological bond that has developed between Shane and the Millers. This factor will frequently be controlling where, because of the foster or "substitute" parents' interaction with a child on a daily basis and relating to the child's emotional needs, the

---

12. A recent article in Parade Magazine, August 21, 1983, for example, stated:

Over the years, have we Americans become a more tolerant people? Do we harbor less racial and religious prejudice than we did five or 15 years ago? The answer, according to the Gallup pollsters, is yes. Recently they asked a nationwide sampling of 1517 adults (18 and over) this question: "Do you approve or disapprove of marriage between whites and non-whites? Catholics and Protestants? Jews and non-Jews?"

They had polled on that same question in 1968, 1972 and 1978. The 1983 results show that 43% approve of marriage between whites and non-whites, 50% disapprove, and 7% have no opinion. Fifteen years ago, only 20% approved, 72% disapproved, and 8% had no opinion.

Fifteen years ago, 63% approved of marriage between Catholics and Protestants, 22% disapproved, and 15% had no opinion. Today, 79% approve, 10% disapprove, and 11% have no opinion. As for the public's attitude toward marriage between Jews and non-Jews, the approval rate has increased from 59% in 1968 to 77% in 1983. The disapproval rate has declined from 21% to 10%.

"substitute" parents have advanced, for all practical purposes, to become the child's "psychological" parents. *Beyond Best Interests, supra* note 1, at 26–27. (The authors would recognize a "common law adoptive parent-child relationship" where such bonding has occurred.)

The concept of "psychological parenting" is not of recent vintage [13] and has been consistently recognized and applied by the appellate courts. In *Albright v. Commonwealth ex rel. Fetters, supra* at 491 Pa. 327–28, 421 A.2d at 160, this Court stated:

> In this case, the hearing court after conceding that the father had entered into an apparently stable second marriage and could provide a good home, nevertheless concluded that the maternal grandparents had presented sufficiently compelling reasons to justify the award of custody to them. Those factors which were deemed to be persuasive were that the children had been exposed to chaotic conditions throughout their lives as a result of the

**13.** In 1889, the Supreme Court of Kansas in the child placement case of *Chapsky v. Wood,* 26 Kan. 650–58 (2nd ed.ann.1889) stated:
[When a] child has been left for years in the care and custody of others, who have discharged all the obligations of support and care which naturally rest upon the parent, then, whether the courts will enforce the father's right to the custody of the child, will depend mainly upon the question whether such custody will promote the welfare and interest of such child. This distinction must be recognized. If, immediately after [giving up the child] reclamation be sought, and the father is not what may be called an unfit person by reason of immorality, etc., the courts will pay little attention to any mere speculation as to the probability of benefit to the child by leaving or returning it. In other words, they will consider that the law of nature, which declares the strength of a father's love is more to be considered than any mere speculation whatever as to the advantages which possible wealth and social position might otherwise bestow. But, on the other hand, when reclamation is not sought until a lapse of years, when new ties have been formed and a certain current given to the child's life and thought, much attention should be paid to the probabilities of a benefit to the child from the change. It is an obvious fact that ties of blood weaken, and ties of companionship strengthen, by lapse of time; and the prosperity and welfare of the child depend on the number and strength of these ties, as well as on the ability to do all which the promptings of these ties compel.
... Above all things, the paramount consideration is, what will promote the welfare of the child?

marital difficulties between the parents and that the home of the grandparents had proven to be the single stabilizing factor in their lives. In *Ellerbe* [*v. Hooks*, 490 Pa. 363, 416 A.2d 512 (1980)] we held that the removal of a child from a secure and familiar environment was the type of factor that could justify the award of the child to a grandparent over the claim of a parent. *Ellerbe v. Hooks, supra.* The adverse effect upon the development of youngsters caused by the disruption of an established stable relationship has been well recognized in this area of the law. *Gunter v. Gunter*, 240 Pa.Super. 382, 399, 361 A.2d 307, 316 (1976).

*See also Commonwealth ex rel. Grimes v. Yack*, 289 Pa.Super. 495, 433 A.2d 1363 (1981) *and In re Desiree B., supra.* Appellants now argue that the hearing court ignored this factor (the psychological bonding/attachment of Shane to the Millers and the trauma that separation would cause), but the record belies this assertion.

The hearing court entertained much testimony about the detrimental effects of removing Shane from his *de facto* grandparents (counsel for appellants characterizes "the relationship between Shane and the Millers ... as that of grandchild and grandparents." Brief for appellants at 10.) to whom he had formed a psychological attachment. The parties all agreed that, under the facts of this case, some trauma and pain was inevitable if Shane were to be transferred to the custody of the Youngs, and *this probability was not taken lightly* by the agency or the court. As Mrs. Norma Fabian, Director of Social Services at Children's Services, stated "There is absolutely no way that a move of this sort can be made without difficulty and without pain for all of the people involved, but the reasons for this [transfer] far outweigh that." N.T. at 92.

While the difficulties could not be eliminated, both the agency and the court took steps to minimize the trauma associated with the transfer. The agency proposed a program of gradual transition that would gradually and flexibly increase the length of Shane's stays with the Youngs

(and absence from the Millers) in accordance with Shane's ability to make the adjustment. N.T. at 50, 78–80, 82–84. Children's Services did not suggest a time schedule but, rather, would adjust their time schedule, and the Young's, to suit Shane's emotional requirements. *Id.* Also important was the fact that Mrs. Young had faced these difficulties before and had surmounted the problems in exemplary fashion with previous foster children. N.T. at 102–03, 110–12. Additionally, the hearing court's order awarding custody to Children's Services granted liberal visitation rights to appellants and directed Children's Services to provide the necessary transportation.

At the risk of being redundant, we must stress that psychological bonding, *like all other factors,* is merely *one* of the elements, albeit an important one, that must enter into the court's determination and, in appropriate cases, can be outweighed by countervailing factors. *Commonwealth ex rel. Grimes v. Yack, supra; Gunter v. Gunter, supra.* On the record before us, we can find no error in the court's determination that, in 1979, the psychological bonding of Shane to appellants did not preclude an award of custody to the Youngs based on substantial countervailing elements, especially given the liberal visitation and gradual transition program contemplated.

Appellant's also argue that the case should be remanded due to the absence on the record of a psychological or psychiatric evaluation of Shane, the Youngs and the Millers. We do not agree that a remand for the inevitable battle of expert witnesses, *Commonwealth ex rel. Grimes v. Yack, supra* 289 Pa.Super. 526, 433 A.2d 1380–81 *and Farmer v. Farmer, supra,* is necessary in this case, since the court proceeded on the assumption (stipulation) that Shane would suffer some trauma because of a separation from the Millers, heard extensive testimony from Mrs. Miller, Mrs. Young and witnesses from Children's Services on the psychological makeup of the respective parties, and took steps to minimize the inevitable trauma. Moreover, counsel for appellants did *not* request the court to order psychiatric

evaluations, N.T. 257, even though the agency expressed the opinion that such evaluations would be in order, N.T. 81, and, since Shane was in the physical custody of the Millers, they would have been in the best position to have Shane interviewed by a psychologist or psychiatrist. The Juvenile Act gives the hearing court *discretion* to order the child examined by a physician or psychologist, 42 Pa.C.S.A. § 6339(b), and, as appellants did not request the court to exercise its discretion and the record was fully adequate otherwise, we will not order a remand solely for psychiatric/psychological evaluation. We note, however, that it would seem to be the better approach for the court to order such evaluation whenever it becomes apparent that emotional/psychological problems may be encountered with a given custody award.

The preference of a child is also, certainly, to be considered by the court, *Tobias v. Tobias,* 248 Pa.Super. 168, 171, 374 A.2d 1372, 1373 (1977), although a child's youthfulness may require some "considerable discounting" of the stated preference. *Gunter v. Gunter, supra,* 240 Pa.Superior Ct. 389 n. 2, 361 A.2d at 311 n. 2 (seven year old child). *See Commonwealth ex rel. Murphy v. Murphy,* 258 Pa.Super. 418, 392 A.2d 863 (1978). The hearing court did consider Shane's expressed preference to remain with appellants, but appropriately, did not weight this factor heavily since Shane was only six years old at the time. *See, e.g. Tomlinson v. Tomlinson,* 248 Pa.Super. 196, 374 A.2d 1386 (1977) (in light of other factors favoring custody of mother, trial court's overemphasis of thirteen-year old daughter's preference for father was error).

Appellants argue that the failure of the hearing court to interview Shane on the record was erroneous. We agree that the much preferred practice is for the court to interview the child on the record for whatever light he or she might be able to shed on the issues of his/her disposition. While the credence to be given the child's testimony may reflect his/her lack of maturity and experience, that child should be treated with dignity and afforded an opportunity

to express an opinion. He or she is a captive participant in an imposing legal system and should be allowed to feel a *part* of that system, to whatever extent is possible. Nevertheless, on the basis of the extensive record developed at the hearings at which Shane's preference and psychological attachment to the Millers was otherwise fully developed, we cannot say that the failure to interview Shane was erroneous or grounds for a remand.

The failure to interview Shane on the record does, however, raise a disturbing aspect of the case. As noted, the preferred practice is to interview the child whose interests are, after all, the *only* proper focus of a placement proceeding. The court proceeded with the intention of interviewing Shane on the last day of hearings, but counsel for Children's Services interposed an objection, and was joined by the attorney for CPLS who was appointed to represent Shane. The court then sustained these objections. The disturbing feature of these events is this: counsel appointed to represent a child should certainly not be interjecting objections to having his client's testimony brought before the court and placed on the record! Just as the court is not controlled by the stated preference of the child, appointed counsel [14] should not be satisfied merely with the stated preference but, instead, should form an opinion as to the child's best interest after reasonable investigation of all relevant facts and circumstances. Counsel for Shane has vociferously argued that Shane's best interests would be served by awarding custody to Children's Services to be placed with the Youngs. Yet counsel does the child a disservice if he does not take care to submit the child's viewpoint/preference to the court, offer whatever reasonable support may exist for that viewpoint, and explain why counsel's opinion as to the "best interests" differs from that of the child/client. This disservice was compounded in the instant case by the lack of follow-up by appointed counsel for, as was disclosed at oral argument in response to questioning from the bench, no one

14. The child's right to counsel is provided for in 42 Pa.C.S.A. § 6337.

from CPLS had spoken with Shane since the hearings below. We are sorely disappointed with the caliber of Shane's representation in this regard as it seems to relegate the child/client to second-class citizenship. However, given the complete development of the record below, which record supports the court's disposition, counsel's omissions did not, fortunately, prejudice Shane.

All things considered, the lower court's opinion was thorough, comprehensive and specific and his conclusions were fully supported by competent evidence on the record. We would affirm the court's disposition, therefore, but for one complicating factor which necessitates further proceedings.

Four years have now elapsed since the last hearing on this matter, during which time, as counsel at oral argument represented to this Court, Shane has remained in appellants' physical custody. This inordinate passage of time has created a gap on the record which can, unfortunately, be remedied only by a remand.

In August, 1979, Shane had already formed a strong psychological attachment to appellants. He has now been with them continuously for more than five years. How much greater is that attachment now? If trauma was to some extent inevitable in 1979, how much more so at this point? Much may have happened since 1979 in terms of Shane's adjustment at Stony Run, attachments with his siblings and perhaps the Youngs, his progress at school, the development of his personal and social identity, the health of the respective parties, etc. There is simply too much unknown at this point to allow us to affirm without qualification, which affirmance would effectuate Shane's transfer to Children's Services and the Youngs. Accordingly, we must remand to the Court of Common Pleas of Berks County for an immediate and expedited evidentiary hearing to consider all relevant events and circumstances that have transpired since August, 1979.

This case highlights a major, recurring problem in child placement cases—where the child is temporarily in the custody of foster parents, some amount of psychological bonding will usually occur. Where the courts, both hearing and appellate, lumber along at their typical snail's pace, as in the instant proceedings, this bonding will grow stronger and the trauma associated with a transfer of custody will magnify proportionately. Thus, the authors of *Beyond Best Interests, supra* note 1 at 42–43, offer:

> The procedures of child placement are not designed to assure a prompt final decision. The process is characterized by extended periods of uncertainty caused by overcautious and overworked administrative agencies; by courts with overcrowded dockets, extended and oft-postponed hearings; and by judges who are inclined to procrastinate before rendering their decisions at trial or on appeal.
>
> .     .     .     .     .
>
> The courts, social agencies, and all the adults concerned with child placement must greatly reduce the time they take for decision. While the taking of time is often correctly equated with care, reasoned judgment, and the assurance of fairness, it often also reflects too large and burdensome caseloads or inefficiently deployed resources. Whatever the cause of the timetaking, the costs as well as the benefits of the delay to the child must be weighed. Our guideline would allow for no more delay than that required for reasoned judgment. By reasoned judgment we do not mean certainty of judgment. We mean no more than the most reasonable judgment that can be made within the time available—measured to accord with the child's sense of time. Therefore, to avoid irreparable psychological injury, placement, whenever in dispute, must be treated as the emergency that it is for the child.*

---

(* Three months may not be a long time for an adult decisionmaker. For a young child it may be forever.)

In accordance with those guidelines, the Juvenile Act establishes 20 days from the time a finding of dependency is

made as the period within which the hearing court is to enter its disposition, unless the hearings are continued for a "reasonable period to receive reports and other evidence bearing on the disposition. . . ." 42 Pa.C.S.A. § 6341(c) and (e). Obviously, the hearing court was far from acting within those guidelines. Equally obvious, the present appellate procedures, both in this Court and the Superior Court, are wholly unsatisfactory in cases of this nature where a child's well-being and emotional development is at stake. While the delays here and below may have been "normal" given the crowded calendars of all courts, this "normalcy" *cannot be tolerated in child placement cases.* Accordingly, this Court will refer this matter to the appropriate Rules Committees with instructions to develop an expedited procedure for evidentiary hearings and appellate review. In the interim, the lower courts and the Superior Court are directed to give these cases priority treatment and expedite the proceedings to the full extent of their resources.

In the instant case, we direct the lower court, upon remand, to impose a strict time schedule upon the parties for investigation, evaluations (clinical/psychological) and hearings and to thereafter render a disposition within the guidelines of the Juvenile Act.

For the foregoing reasons, we vacate the order of the Superior Court affirming the order and award of custody by the Court of Common Pleas of Berks County, and remand this case to the Court of Common Pleas of Berks County for further proceedings consistent with this opinion; given our present familiarity with this case and the further delays that would ensue if this matter were to be appealed to the Superior Court, this Court shall retain jurisdiction in the event of an appeal.

ROBERTS, C.J., agrees that the case must be remanded for an evidentiary hearing to update the present record. *See, e.g., In re: G.R.,* 485 Pa. 46, 400 A.2d 1304 (1979).

148

NIX, J., did not participate in the consideration or decision of this case.

FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ., concurred in the result.